# 23-354 (L), 23-797(C)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

ESTATE OF JESSE NATHANAEL ALIGANGA, et al.,
RIZWAN KHALIQ, et al., JAMES OWENS, et al.,

*Plaintiffs-Appellants,*

v.

TALIBAN, AKA THE ISLAMIC EMIRATE OF AFGHANISTAN,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Southern District of New York
Hon. Valerie E. Caproni
Case No. 1:22-cv-01949 (VEC)

---

**Opening Brief of Plaintiffs-Appellants**

---

*(Counsel for Plaintiffs-Appellants Listed on Inside Cover)*

Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-5236
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

Clifton S. Elgarten
Emily M. Alban
CROWELL & MORING LLP
1001 Pennsylvania Ave. N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
celgarten@crowell.com
ealban@crowell.com

Matthew D. McGill
    *Counsel of Record*
Jessica L. Wagner
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com
jwagner@gibsondunn.com

Jane Carol Norman
BOND & NORMAN LAW, PC
6205 Executive Blvd.
Rockville, MD 20852
Telephone: (202) 682-4100
Facsimile: (202) 207-1041
jnorman425@icloud.com

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT ......................................................4

ISSUES PRESENTED..........................................................................4

STATEMENT OF THE CASE ..............................................................5

I.     Factual Background........................................................................6

    A.    The Embassy Attacks .........................................................6

        1.    The Taliban And Al-Qaeda's Origins ............................6

        2.    The Planning And Execution Of The Embassy
              Bombings.................................................................9

    B.    The Taliban Takeover And Executive Order 14064 .............10

        1.    The Taliban Takeover Of DAB ....................................10

        2.    Executive Order 14064 Prevents The Taliban Transfer
              Of The Funds .............................................................15

II.    Procedural History.......................................................................16

    A.    Attachment Proceedings....................................................16

    B.    Default Judgment Proceedings ..........................................19

    C.    Proceedings In This Court..................................................20

SUMMARY OF ARGUMENT..............................................................21

STANDARD OF REVIEW ..................................................................24

ARGUMENT.......................................................................................25

I.     This Court Has Jurisdiction..........................................................25

i

A.     Victims Have Article III Standing. ..........................................25

B.     This Court Has Jurisdiction Over Victims' Appeal From Final Judgment.......................................................................26

C.     Alternatively, This Court Has Jurisdiction Over Victims' Interlocutory Appeal...............................................................28

II.    The District Court Erred In Vacating Victims' Attachment Of The Funds. ..............................................................................................32

A.     Victims Satisfy All The Requirements For Prejudgment Attachment...................................................................................32

B.     The District Court Erred By Vacating The Attachment Under The FSIA...................................................................34

        1.     Because The Sovereign Status Of DAB Is Disputed, The District Court Erred By Enforcing Attachment Immunity *Sua Sponte*. .................................................35

        2.     The District Court Erred In Deferring To The Executive's Assertion That The FSIA Provides Attachment Immunity For DAB's Assets.......................42

        3.     The Undisputed Facts Demonstrate That The Funds Are Not Immune From Attachment Under The FSIA. ...........................................................53

CONCLUSION .........................................................................................72

# TABLE OF AUTHORITIES

Page(s)

## Cases

*ACLU v. Dep't of Just.*,
  894 F.3d 490 (2d Cir. 2018)....................................................27

*The Anne*, 16 U.S. (3 Wheat.) 435 (1818) ...............................38

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  823 F.3d 51 (2d Cir. 2016)......................................................11

*Aurelius Cap. Partners, LP v. Republic of Argentina*,
  584 F.3d 120 (2d Cir. 2009)............................................24, 56

*Bank of China v. Wells Fargo Bank & Union Tr. Co.*,
  209 F.2d 467 (9th Cir. 1953) ..................................................68

*Banque Nordeurope S.A. v. Banker*,
  970 F.2d 1129 (2d Cir. 1992).........................................29, 31

*Beierwaltes v. L'Office Federale De La Culture De La Confederation
  Suisse*, 999 F.3d 808 (2d Cir. 2021) ...............................46, 47

*Brastex Corp. v. Allen Int'l, Inc.*,
  702 F.2d 326 (2d Cir. 1983)....................................................30

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999)....................................................46

*Camreta v. Greene*,
  563 U.S. 692 (2011)..................................................................27

*Cap. Ventures Int'l v. Republic of Argentina*,
  443 F.3d 214 (2d Cir. 2006)....................................................33

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*,
  948 F.2d 111 (2d Cir. 1991).......................................29, 30, 36

*Cinema 5, Ltd. v. Cinerama, Inc.*,
  528 F.2d 1384 (2d Cir. 1976)..................................................66

*City of New York v. Mickalis Pawn Shop, LLC,*
645 F.3d 114 (2d Cir. 2011) ................................................. 27

*City of New York v. Permanent Mission of India,*
446 F.3d 365 (2d Cir. 2006) ........................................ 43, 51, 53

*Cohen v. Beneficial Indus. Loan Corp.,*
337 U.S. 541 (1949) ............................................................ 30

*Dayco Corp. v. Foreign Transactions Corp.,*
705 F.2d 38 (2d Cir. 1983) .................................................. 31

*Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper,*
445 U.S. 326 (1980) ............................................................ 27

*In re DES Litig.,*
7 F.3d 20 (2d Cir. 1993) ................................................. 27, 28

*EM Ltd. v. Republic of Argentina,*
473 F.3d 463 (2d Cir. 2007) ........................................ 24, 25, 56

*Exp.-Imp. Bank of the Republic of China v. Grenada,*
768 F.3d 75 (2d Cir. 2014) .................................................. 55

*Filler v. Hanvit Bank,*
378 F.3d 213 (2d Cir. 2004) ............................... 57, 61, 62, 65

*The Gul Djemal*, 264 U.S. 90 (1924) ............................... 38, 39

*India S.S. Co. v. Kobil Petroleum Ltd.,*
620 F.3d 160 (2d Cir. 2010) .................................................. 4

*Iraq Telecom Ltd. v. IBL Bank S.A.L.,*
43 F.4th 263 (2d Cir. 2022) ................................................ 34

*Kelly v. Syria Shell Petroleum Dev. B.V.,*
213 F.3d 841 (5th Cir. 2000) .............................................. 57

*Kensington Int'l Ltd. v. Republic of Congo,*
461 F.3d 238 (2d Cir. 2006) ........................................ 28, 29, 31

*Kirschenbaum v. 650 Fifth Ave. & Related Props.,*
830 F.3d 107 (2d Cir. 2016) ........................................ 49, 50, 55

iv

*Kirschenbaum v. Assa Corp.*,
    934 F.3d 191 (2d Cir. 2019)...........................................................49, 66

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*,
    937 F.2d 44 (2d Cir. 1991)...........................................................57

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*,
    300 F. 891 (S.D.N.Y. 1924)...........................................................38

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*,
    32 F.2d 195 (2d Cir. 1929)...........................................................39

*Loomis v. Rogers*,
    254 F.2d 941 (D.C. Cir. 1958)...........................................................39

*LPP Mortg., Ltd. v. Brinley*,
    547 F.3d 643 (6th Cir. 2008) ...........................................................26

*Ex parte Muir*,
    254 U.S. 522 (1921)...........................................................38

*NML Cap., Ltd. v. Banco Cent. de la Republica Arg.*,
    652 F.3d 172 (2d Cir. 2011)...........................................54, 67, 68, 69

*O'Bryan v. Holy See*
    *See*, 556 F.3d 361 (6th Cir. 2009)...........................................................50

*Owens v. Taliban*,
    2022 WL 1090618 (S.D.N.Y. Apr. 11, 2022) ...........................................................6

*Owens v. Taliban*,
    2023 WL 2214887 (S.D.N.Y. Feb. 24, 2023) ...........................................................6

*The Pesaro*, 255 U.S. 216 (1921)...........................................................38

*Peterson v. Islamic Republic of Iran*,
    2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013) ...........................................................68

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ...........................................37, 38, 39, 40

*Puente v. Spanish Nat'l State,*
116 F.2d 43 (2d Cir. 1940)....................................................39

*Republic of Argentina v. NML Cap., Ltd.,*
573 U.S. 134 (2014)..............................................................45

*Republic of Austria v. Altmann,*
541 U.S. 677 (2004)..............................................43, 44, 45, 46, 48

*Republic of Panama v. Republic Nat'l Bank of N.Y.,*
681 F. Supp. 1066 (S.D.N.Y. 1988) ......................................68

*Republic of Philippines v. Marcos,*
806 F.2d 344 (2d Cir. 1986)..........................................37, 39

*Result Shipping Co. v. Ferruzzi Trading USA Inc.,*
56 F.3d 394 (2d Cir. 1995)............................................29, 30

*Rubin v. Islamic Republic of Iran,*
637 F.3d 783 (7th Cir. 2011) .........................................37, 51

*S & S Mach. Co. v. Masinexportimport,*
706 F.2d 411 (2d Cir. 1983)...................................................55

*Skidmore v. Swift & Co.,*
323 U.S. 134 (1944)..............................................................51

*Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.,*
339 U.S. 684 (1950)..............................................................30

*In re Terrorist Attacks on Sept. 11, 2001,*
538 F.3d 71 (2d Cir. 2008)....................................................65

*The Schooner Exchange v. McFaddon,*
11 U.S. (7 Cranch) 116 (1812) ............................................43

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021).........................................................26

*United States v. Sineneng-Smith,*
140 S. Ct. 1575 (2020)...................................................18, 41

*United States v. Vazquez*,
  145 F.3d 74 (2d Cir. 1998)..................................................25, 28

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983).................................................44, 45, 46

*Walters v. Indus. & Com. Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011)...............................24, 35, 36, 37

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
  576 U.S. 1 (2015)..........................................................43, 47, 48

**Constitutional Provisions**

U.S. Const. art. II, § 3 ...............................................................48

**Statutes**

28 U.S.C. § 1291 ...............................................................4, 26, 28

28 U.S.C. § 1330 ...............................................................36

28 U.S.C. § 1331 ...............................................................4

28 U.S.C. § 1332 ...............................................................4

28 U.S.C. § 1350 ...............................................................4

28 U.S.C. § 1367 ...............................................................4

28 U.S.C. § 1603 ...............................................48, 50, 54, 55, 56

28 U.S.C. § 1609 ...............................................................36

28 U.S.C. § 1611 ...............................................................
  ............ 2, 3, 4, 5, 6, 19, 22, 23, 24, 35, 36, 40, 41, 53, 54, 66, 67, 70, 71

Afghanistan Bank Law (Dec. 17, 2003),
  https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf
  ...............................................................55, 59, 60, 62, 71

N.Y. C.P.L.R. § 5234...............................................................26

N.Y. C.P.L.R. § 6212...............................................................32, 34

vii

**Regulations**

Executive Order 14064...........................................................15, 52, 53, 71

**Rules**

Fed. R. Civ. P. 64.................................................................................26, 32

Fed. R. Evid. 201 .....................................................................................11

**Other Authorities**

Antony J. Blinken, *Executive Order to Preserve Certain Afghanistan Central Bank Assets for the Benefit of the People of Afghanistan*, U.S. Dep't of State (Feb. 11, 2022), https://www.state.gov/executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-benefit-of-the-people-of-afghanistan/ ..............................................................52

*Black's Law Dictionary* (11th ed. 2019) ...................................................68

David D. Siegel, *New York Practice* (6th ed.)....................................17, 34

Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265 (1982) ......68

Jesse Andrews Raymond, *Sovereign Immunity in Modern Admiralty Law*, 9 Tex. L. Rev. 519 (1931)..............................................................38

Kevin P. Simmons, Note, *The Foreign Sovereign Immunities Act of 1976: Giving the Plaintiff His Day in Court*, 46 Fordham L. Rev. 543 (1977)...................................................................................................45

Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*, 44 Vanderbilt J. Transnational L. 911 (2011)....................................46

Restatement (Fourth) of Foreign Relations Law (2023) .............46, 48, 49

Restatement (Second) of Agency (1958)....................................................66

Restatement (Third) of Agency (2006) .....................................................66

Special Inspector General for Afghanistan Reconstruction, *Quarterly Report to the United States Congress* (Apr. 30, 2023), https://www.sigar.mil/pdf/quarterlyreports/2023-04-30qr.pdf ........... 59

U.S. Dep't of State, Bureau of South & Central Asian Affairs, *U.S. Relations with Afghanistan* (Aug. 15, 2022), https://www.state.gov/u-s-relations-with-afghanistan/ ................................................. 10, 51, 56

U.S. Embassy in Afghanistan, *Joint State-Treasury Statement: The Afghan Fund* (Sept. 13, 2022), https://af.usembassy.gov/joint-state-treasury-statement-the-afghan-fund/ ................................................. 65

William Bateman & Jason Allen, *The Law of Central Bank Reserve Creation*, Modern L. Rev. 401 (2022) ................................................. 69

## INTRODUCTION

Plaintiffs-Appellants ("Victims") are 197 victims of the 1998 U.S. embassy bombings in Nairobi, Kenya and Dar es Salaam, Tanzania perpetrated by Osama Bin Laden and al-Qaeda, with substantial assistance from the Taliban a/k/a Islamic Emirate of Afghanistan ("Taliban"), Sudan, and Iran. Victims previously obtained significant judgments—largely unsatisfied—against Sudan and Iran. In this case, Victims obtained a $5.2 billion judgment against the Taliban.

Prior to judgment, the district court granted Victims a $1.4 billion attachment of Taliban assets held at the Federal Reserve Bank of New York ("Federal Reserve"). The assets are held in the name of Da Afghanistan Bank ("DAB"), which had been the central bank of Afghanistan but has been under Taliban control since the Taliban retook Afghanistan in August 2021. Since then, the Taliban has installed known terrorists to lead DAB, directed all of DAB's operations, and claimed $7 billion held in DAB's name ("Funds") at the Federal Reserve. The President responded by issuing an Executive Order blocking the Funds. The Order contemplates that the Funds could thereafter be used to satisfy "legal claims" of "victims of terrorism." AA234.

1

When the district court granted the prejudgment attachment, it concluded in a detailed opinion that Victims satisfied all requirements for attachment under New York law. Victims had demonstrated a need to secure the Funds given the Taliban's limited assets in the United States and the numerous other creditors seeking them.

When Victims later moved to confirm the attachment, however, the district court vacated it. The court did not disturb its prior conclusion that Victims satisfied all requirements for attachment under New York law. Rather, relying on a statement of interest filed by the United States mere hours before the court rendered its decision, the court *sua sponte* concluded that the Funds were immune from attachment under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1611(b).

That *sua sponte* determination of immunity under the FSIA was erroneous and should be reversed for three reasons. *First*, a court may enforce FSIA attachment immunity *sua sponte* only when the sovereign ownership of the targeted property is beyond dispute. That is not the case here. To the contrary, the various enforcement efforts by victims of terrorism against the Funds have been predicated from the start on the fact that the Funds now are owned by the Taliban by dint of its takeover

of Afghanistan and DAB. The district court therefore erred by enforcing a putative attachment immunity *sua sponte*.

*Second*, the district court erred in deferring to the government's unreasoned position that the Funds are immune from attachment under Section 1611. The FSIA was enacted precisely to shift responsibility for making determinations about foreign sovereign immunity from the Executive to the Judiciary. And deference to the Executive's newly minted litigation position was especially unwarranted here because the Executive's actions—including its seizure and transfer of $3.5 billion of the Funds—are incompatible with the notion that the Funds are immune central-bank assets. The district court should have made an independent determination of whether the Funds were immune, which it failed to do.

*Third*, when evaluated on the merits, Section 1611(b) provides no immunity for the blocked Funds. That provision affords protection only when the funds of a foreign state are being used by the state's central bank for central-banking functions. The Funds are not the property of a foreign state because DAB no longer functions as an agency or instrumentality of Afghanistan; DAB now is a tool of the Taliban, a non-state actor. Moreover, the Funds are not being used for central-banking

3

functions. The United States blocked the Funds explicitly to prevent DAB—and the Taliban—from accessing them for *any* banking functions. Section 1611(b) does not immunize the Funds from attachment.

The district court's order vacating Victims' attachment should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Victims' suit under 28 U.S.C. §§ 1331, 1332, 1350, and 1367(a). *See* AA167, ¶¶ 4-6. The district court had jurisdiction to order attachment of the Funds held at the Federal Reserve Bank of New York because those Funds are within the territorial limits of the State in which the district court is located. *India S.S. Co. v. Kobil Petroleum Ltd.*, 620 F.3d 160, 162 (2d Cir. 2010) (per curiam).

This Court has jurisdiction in No. 23-797 under 28 U.S.C. § 1291. *See infra* Part I.B. This Court has jurisdiction in No. 23-354 under 28 U.S.C. § 1291 and the collateral-order doctrine. *See infra* Part I.C.

## ISSUES PRESENTED

I. Whether the district court erred in applying the FSIA *sua sponte*, given that DAB's sovereign status is disputed.

4

II.    Whether the district court erred in deferring to the Executive Branch's conclusory assertion that the Funds are immune under the FSIA, rather than independently assessing the Funds' immunity under the FSIA's text and controlling precedent.

III.    Whether the district court erred in holding that the Funds are entitled to immunity from attachment under the FSIA, 28 U.S.C. § 1611(b), as the property of a foreign central bank held for its own account, considering that the Taliban, a terrorist entity, now controls DAB, and the Funds held in DAB's name are blocked by Executive Order and are not being used for any central-banking purposes.

## STATEMENT OF THE CASE

Plaintiffs-Appellants are 197 victims of the 1998 U.S. embassy bombings in Nairobi, Kenya and Dar es Salaam, Tanzania perpetrated by Osama Bin Laden and al-Qaeda, with substantial assistance from the Taliban, Sudan, and Iran.  Victims sued the Taliban for its role in the bombings, asserting claims under the Anti-Terrorism Act, the Alien Tort Statute, and state law.  The district court granted Victims an *ex parte* prejudgment attachment of approximately $1.4 billion in Taliban assets

held in the name of DAB at the Federal Reserve. *See Owens v. Taliban*, 2022 WL 1090618 (S.D.N.Y. Apr. 11, 2022) (Caproni, J.) (AA307).

Ten months later, the district court denied Victims' motion to confirm the order of prejudgment attachment and vacated the attachment, concluding *sua sponte* that the Funds were immune from attachment under the FSIA, 28 U.S.C. § 1611(b). *See Owens v. Taliban*, 2023 WL 2214887 (S.D.N.Y. Feb. 24, 2023) (Caproni, J.) (AA454). Victims filed an appeal from that collateral order (No. 23-354). AA471.

Soon thereafter, the district court entered a default judgment against the Taliban for approximately $5.2 billion. AA476. Victims filed an appeal from that final judgment and all rulings incorporated into the final judgment, including the order vacating the attachment (No. 23-797). AA527.

## I.    Factual Background

### A.    The Embassy Attacks

#### 1.    The Taliban And Al-Qaeda's Origins

The Taliban is a militant Islamic fundamentalist organization that seeks to establish a Sharia-governed state in Afghanistan. AA238. By 1996, the Taliban had seized control of much of Afghanistan and

purported to establish the Islamic Emirate of Afghanistan. AA240. The Islamic Emirate of Afghanistan was never recognized as the legitimate government of Afghanistan by the United States. AA240.

As part of its original takeover, the Taliban seized control of DAB, appointing first a military chieftain and then a terrorist financier to head the bank. AA436, ¶ 22. The Taliban used its "control over DAB to make a run on Afghanistan's domestic banks, looting both DAB and other banks of their cash," and then used those funds to "finance terrorism." AA435-37, ¶¶ 21-23. DAB ceased operating as a central bank and ceased issuing currency. AA435-36, ¶ 21. In 2000, recognizing that DAB was "controlled by the Taliban," and that "the Taliban ha[d] an interest" in DAB, the Office of Foreign Assets Control ("OFAC") "added DAB to the list of sanctioned Taliban affiliates." AA438, ¶ 26 (alteration in original). The Taliban ruled Afghanistan until 2001, when an American-led coalition invaded Afghanistan after the September 11 terrorist attacks and removed the Taliban from power. AA241. Shortly before the United States took control, the then-head of the Taliban ordered DAB to disburse $168 million to various named individuals, including terrorism financiers who funneled money to al-Qaeda. AA437, ¶ 24.

7

For virtually its entire existence, the Taliban has extensively supported al-Qaeda. Al-Qaeda, which was founded by Osama Bin Laden in Afghanistan in the late 1980s, is a terrorist organization that seeks to purge the Islamic world of American and Western influences. Dkt. 6-3, at 1-2.[1] Originally based in Afghanistan and Pakistan, al-Qaeda relocated to Sudan in 1991, and the Sudanese government supported al-Qaeda there for the next five years. Dkt. 6-4, ¶ 1. In 1996, Bin Laden was expelled from Sudan and returned to Afghanistan, where al-Qaeda set up its new base of operations and assisted the Taliban in its conquest of the country. Dkt. 6-3, at 3. The Taliban supplied al-Qaeda with protection, training facilities, and use of Afghanistan's national airline to transport members, money, recruits, and weapons overseas, providing al-Qaeda "a sanctuary in which to train … terrorists, import weapons, forge ties with other jihad groups and leaders, and plot and staff terrorist schemes." AA260; Dkt. 6-8, at 3.

---

[1] Citations to "Dkt." refer to the district court's docket, No. 1:22-cv-01949 (S.D.N.Y.).

8

### 2.    The Planning And Execution Of The Embassy Bombings

Bin Laden declared war on the United States via fatwa from Taliban-controlled Afghanistan in 1996.   Dkt. 6-9, at 1-2.   In February 1998, Bin Laden issued another widely circulated fatwa from Afghanistan calling for Muslims to "kill the Americans and their allies— civilians and military."   Dkt. 6-10, at 2.   Two months later, the U.S. Ambassador to the United Nations asked the Taliban to surrender Bin Laden.   The Taliban refused.   Dkt. 6-11, at 5.

Around the same time, al-Qaeda began to plan the attacks on the U.S. embassies in Nairobi and Dar es Salaam.   AA263.   Bin Laden and one of his deputies led the planning from Taliban-controlled Afghanistan. AA261-64.   Key operatives, including multiple bombers, were trained in Taliban-controlled territory.   Dkt. 6-13, at 70; Dkt. 6-14, at 6.

On August 7, 1998, the eighth anniversary of the American deployment of troops to Saudi Arabia in Operation Desert Storm, al-Qaeda operatives concurrently detonated suicide bombs at the embassies.   AA268.   The Nairobi explosion killed 213 people, including 12 Americans (11 represented in this case).   AA268.   Over 4,000 others were injured (16 represented here).   AA267-68.   The Dar es Salaam

9

explosion killed 11 people (five represented here) and injured 85 more (five represented here).  AA268.

The Taliban's shelter and material support to Bin Laden and al-Qaeda—through the provision of weapons, training camps, air travel, and protection from the outside world—were crucial to their ability to plan and carry out the attacks.  *See, e.g.*, Dkt. 6-18, at 12, 14, 16, 22, 25-26.

## B.    The Taliban Takeover And Executive Order 14064

### 1.    The Taliban Takeover Of DAB

After the September 11 attacks, the United States invaded Afghanistan and toppled the Taliban.  When American forces withdrew in the summer of 2021, however, the Taliban launched an offensive and retook the country.  AA272.  No country has recognized the Taliban as Afghanistan's legitimate government.  AA283.  And the United States does not currently recognize "any other entity as the Government of Afghanistan" either.[2]

---

[2] U.S. Dep't of State, Bureau of South & Central Asian Affairs, *U.S. Relations with Afghanistan* (Aug. 15, 2022), https://www.state.gov/u-s-relations-with-afghanistan/.  The Court "may properly take judicial notice" of this and other government documents cited throughout the brief because they are "publicly available and [their] accuracy cannot reasonably

When the Taliban retook Kabul, DAB's senior leaders, including its acting governor, fled Afghanistan or went into hiding. AA407-08, ¶ 47. The Taliban appointed Haji Mohammed Idris—an "obscure official" and "Taliban loyalist" with little formal education or training—as DAB's acting governor. AA338, ¶ 55; *see* AA408, ¶¶ 48-49. Idris had previously headed the Taliban's finance commission, which was responsible for "collecting money from narcotics trafficking and illegal taxes from businesses and farmers to fund the Taliban's insurgency." AA338-39, ¶ 55.

The Taliban appointed two more individuals that the United States has designated as Specially Designated Global Terrorists to the next-most senior positions at DAB—Ahmad Zia Agha, as first deputy governor of DAB, and Abdul Qadeer Basir Abdul Baseer, as second deputy governor. AA408-10, ¶¶ 51-57. Agha is a "[s]enior Taliban official with military and financial responsibilities," who "distributed money to Taliban commanders" and reportedly managed funds intended for bombmaking. AA409, ¶ 52; AA342, ¶ 62. Baseer previously provided tens of thousands

---

be questioned." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016); *see* Fed. R. Evid. 201(b), (d).

of dollars to Taliban commanders to carry out attacks and collected narcotics-trafficking money for the Taliban. AA410, ¶ 57; AA348, ¶ 75. Personnel changes have permeated every level of DAB. AA410-11, ¶¶ 58-59; AA442, ¶ 43. The Taliban has banned women from DAB, and DAB employees must keep beards and pray five times a day. AA443, ¶ 46; AA413, ¶¶ 64-65.

DAB's operations are further directed by the Taliban's Council of Ministers and Economic Commission. AA411, ¶ 60. The Taliban operates DAB without "any pretense" of independence. AA356-57, ¶ 92. A senior Taliban official sanctioned by the United Nations for narcotics trafficking, Mawlawi Abdul Salam Hanafi, recently led a financial meeting at DAB. AA411-12, ¶ 61; AA357, ¶ 94; AA374, ¶ 139. And the Taliban's Economic Commission, itself chaired by another U.N.-sanctioned official, has issued direct commands to DAB on economic issues like currency depreciation. AA411, ¶ 60; AA356-57, ¶ 92; AA374, ¶ 139.

The Taliban has established a committee to revise Afghanistan's central-banking laws and to eliminate DAB's modern framework, replacing it with traditional Islamic banking, which has stringent limitations on loans and credits. AA413-14, ¶ 66. The Taliban flag now flies at DAB

12

meetings, AA412, ¶ 62; AA364-66, ¶¶ 115-19, which begin with Taliban-mandated prayer, AA412-13, ¶¶ 62-63; AA366-67, ¶¶ 120-21.

Unsurprisingly, the Taliban has turned DAB from a legitimate central bank into an arm of its narcotics-trafficking and money-laundering operations. As U.S. Special Representative for Afghanistan Thomas West confirmed, important banking "functions" at DAB have "atroph[ied] or [al]together disappear[ed]." AA411, ¶ 59; AA360-61, ¶ 102. Instead, the Taliban's control of DAB enables the Taliban to further its illicit narcotics trade—the primary source of Taliban funding. AA419-21, ¶¶ 82-89. While "decommissioning" central-bank capacities, the Taliban has "supercharg[ed]" its ability to engage in money laundering and to conceal terrorist-financing transactions. AA379, ¶ 155; AA385, ¶ 163. The Taliban is not enforcing anti-money laundering/combating the financing of terrorism ("AML/CFT") laws and regulations. AA420-21, ¶¶ 87-88; AA378, ¶ 151. Instead, Agha, who has been sanctioned *for* terrorism financing, now runs DAB's nominal AML/CFT functions. AA384-85, ¶ 160.

The Taliban also now has access to sensitive financial-intelligence information that was collected by the Financial Transactions and Reports

13

Analysis Center of Afghanistan ("FinTRACA"), the DAB unit previously responsible for identifying and investigating financial improprieties. AA422-24, ¶¶ 90-96. As a result of the Taliban's control, the Egmont Group of Financial Intelligence Units—an intergovernmental organization that provides financial-intelligence units "a secure platform to facilitate the exchange of AML and counterterrorism information"—has suspended FinTRACA from its secure-communications platform. AA425, ¶¶ 98-99.

Because the Taliban has gutted DAB's central-banking functions, numerous experts and officials have commented on the need for a legitimate, independent central bank in Afghanistan. Special Representative West suggested that the United States provide aid to Afghanistan for "potential recapitalization of a central bank that is recognized." AA361, ¶ 104 (emphasis omitted). Graeme Smith of the International Crisis Group testified before Congress that "Afghanistan needs an entity to serve the functions of a central bank." AA372, ¶ 138(a); *see also* AA415, ¶ 71. And a bipartisan group of Members of Congress underscored the same—"Afghanistan will need an entity to serve as a central bank." AA373, ¶ 138(d). Accordingly, the United Nations has been shipping

hundreds of millions of dollars in international aid to Afghanistan since late 2021 *not* via DAB, but via a private bank. AA416-18, ¶¶ 76-78. Non-governmental organizations that formerly transacted with DAB have likewise pursued alternative channels to avoid DAB. AA418, ¶ 79; AA375-76, ¶ 141.

> **2. Executive Order 14064 Prevents The Taliban Transfer Of The Funds**

Soon after it completed its takeover of DAB, the Taliban claimed $7 billion of funds held in the name of DAB at the Federal Reserve. AA291. On February 11, 2022, President Biden responded by issuing Executive Order 14064, which directed U.S. financial institutions holding DAB assets to transfer those assets into a single consolidated account at the Federal Reserve and blocked any further transactions involving those assets absent a license from the Executive Branch. AA234, § 1(b)-(c). The order explained that "the preservation of certain property of [DAB] held in the United States" was necessary in light of the humanitarian crisis in Afghanistan and the "legal claims" of "victims of terrorism." AA234. On the same day, OFAC issued a license directing the Federal Reserve to segregate $3.5 billion of DAB's assets into a separate account for foreign-policy purposes related to Afghanistan. AA298, § 1. As the

15

district court recognized, this left approximately $3.5 billion available "for payment of civil judgments that have been obtained by victims of the Taliban's acts of terrorism." AA307.

## II.    Procedural History

Victims are American and foreign survivors of the embassy bombings, representatives of those killed, and their family members. They filed this action in March 2022, seeking compensatory and punitive damages against the Taliban. AA230-31, ¶¶ 212-17.

### A.    Attachment Proceedings

When Victims filed suit, other creditors of the Taliban, including victims of the September 11 attacks, had already levied writs of execution on the blocked Funds totaling over $2.1 billion. Dkt. 5, at 10. To preserve their ability to collect on a judgment against the Taliban, Victims moved *ex parte* for a prejudgment attachment of the remaining unencumbered amount of the Funds. *Id.* at 1.

The district court granted the motion. AA304. In a thorough opinion, the court concluded that Victims met all the requirements for attachment under New York law. AA311. The court determined that Victims were likely to succeed on the merits of their federal claims. AA312-16.

16

And the court found that "the nature of the Taliban's limited assets in the United States and the potential disbursal of the funds" to other creditors "prevent[ed]" the court from denying attachment. AA318. Pursuant to the court's order, the U.S. Marshals Service served a levy upon the Federal Reserve, the garnishee holding the Funds, for approximately $1.4 billion, plus prejudgment interest (*i.e.*, Victims' expected compensatory damages). AA304; Dkt. 52.

Under New York law, Victims were required to move to confirm their *ex parte* attachment. Confirmation protects an absent defendant as a "follow-up to an ex parte attachment," by providing a defendant an "opportunity to refute the plaintiff's showing." David D. Siegel, *New York Practice* § 315 (6th ed.). Confirmation thus imposes no additional evidentiary or legal burdens on the plaintiff. *See id.* Victims timely moved to confirm the attachment and served that motion on DAB and the Taliban. Dkt. 47.

Neither appeared. Only the garnishee, the Federal Reserve, responded to Victims' motion. The Federal Reserve took "no position" on the merits, yet asserted that the court should consider the applicability of the FSIA "to the extent" that statute applied. Dkt. 61, at 1, 4, 6. In

17

reply, Victims objected to "hypothetical" arguments against confirmation, given the bedrock principle that courts "normally decide only questions presented by the parties." Dkt. 63, at 1-2 (quoting *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020)).

Months later, the district court *sua sponte* requested the views of the United States on whether the FSIA "precludes confirmation." AA449. The government responded in a three-page letter that the FSIA "does preclude confirmation" because "DAB is 'Afghanistan's central bank,'" and the Funds are the property of the state of Afghanistan. AA450-52. But the government provided no factual support for that position. The government's letter failed to address or analyze *any* of the facts at issue. It did not mention that the Taliban had seized control of DAB, nor did it assess the impact of the Taliban's takeover on the immunity analysis. And it made no attempt whatsoever to reconcile its conclusion that the Funds are property of a sovereign state with the Biden Administration taking half of the Funds to fulfill its foreign-policy objectives.

Hours later, and before Victims could respond, the district court denied confirmation and vacated the attachment. AA464. The court recognized that "[t]he standard for confirming an attachment order is the

18

same as that for granting an *ex parte* order of attachment in the first instance." AA459. But the court *sua sponte* determined that Section 1611(b) immunity barred Victims' attachment because the Funds are the property of "a sovereign's central bank." AA461. The court credited Victims' extensive evidence that the Taliban—a non-state actor—controls DAB but held that this evidence could not "change the fact" that the federal government had "define[d]" DAB as "the Central Bank of Afghanistan." AA462. As a result, the court concluded that "central bank immunity" must be "presumed," and Victims' evidence of Taliban control of DAB could never "rebu[t]" that presumption. AA463.

The district court denied Victims' motion for a stay pending appeal. AA465. Victims filed a timely notice of interlocutory appeal from the court's order vacating the attachment. AA471. That appeal is No. 23-354.

### B. Default Judgment Proceedings

In parallel with the attachment proceedings, Victims pressed forward on the merits of their claims against the Taliban. Despite being duly served with Victims' complaint, Dkt. 64, the Taliban never appeared. The district court entered a default judgment against the

19

Taliban in April 2023. AA476. The judgment awarded Victims all the damages they sought: approximately $1.9 billion in compensatory damages (including prejudgment interest) and approximately $3.3 billion in punitive damages, for a total award of approximately $5.2 billion, plus post-judgment interest. AA478-79. Victims filed a timely notice of appeal of this final judgment and all rulings incorporated into it, including the district court's order vacating the attachment (from which Victims had previously filed their interlocutory appeal). AA527. That appeal is No. 23-797.

## C. Proceedings In This Court

The Court consolidated Victims' appeals in No. 23-354 and No. 23-797. *See* No. 23-354, Dkt. 51.

Other creditors of the Taliban also have filed appeals from an order denying their motions for turnover of the Funds. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570, Dkt. 8866 (S.D.N.Y. Feb. 21, 2023); Nos. 23-258, 23-263, 23-304, 23-346, 23-444 ("9/11 Appeals"). This Court consolidated the 9/11 Appeals. *See* No. 23-354, Dkt. 33, at 3. The Court further ordered that the 9/11 Appeals would be "argued in [t]andem" with Victims' appeal. *Id.* But the Court did not consolidate the 9/11

20

Appeals with Victims' appeals, *see id.*, recognizing—as the appellants in both appeals agreed—that the appeals "arise from different district court decisions and present distinct legal and factual questions," No. 23-354, Dkt. 31-1, at 3.

## SUMMARY OF ARGUMENT

**I.** This Court has jurisdiction to review the district court's order vacating the attachment. Victims' Article III standing to pursue this appeal is straightforward: The vacatur of the attachment inflicts a significant monetary injury on Victims—loss of their priority to the Funds and a greatly diminished likelihood of obtaining even partial recovery of their $5.2 billion judgment. That injury can be redressed by an order from this Court reversing the vacatur. Thus, even though Victims prevailed against the Taliban on the merits of their complaint, this Court has jurisdiction over Victims' appeal from the district court's final judgment (No. 23-797), including the order vacating the attachment, which is merged into the final judgment. Alternatively, because vacatur of an attachment is a quintessential collateral order, this Court has jurisdiction over the district court's vacatur order through Victims' interlocutory appeal (No. 23-354).

21

**II.** The district court erred in vacating the attachment.  In initially granting the attachment, the district court found that Victims satisfied all the requirements for attachment under New York law.  The court did not disturb those findings when it vacated the attachment.  Instead, the court vacated the attachment on the completely separate theory that the Funds are immune from attachment under the FSIA, 28 U.S.C. § 1611(b).

That immunity determination was erroneous.  First, the district court should not have enforced DAB's putative FSIA immunity *sua sponte*.  *Sua sponte* consideration of FSIA immunity is improper where the sovereign is absent, and it is unclear that the property at issue actually belongs to a sovereign entity.  That is the case here.  Victims contend that the Funds now belong to the Taliban—a non-state actor—rather than the state of Afghanistan.  Neither DAB nor Afghanistan has even asserted, much less proven, the Funds' immunity.

Even if the district court could enforce FSIA immunity *sua sponte*, however, it erred in its analysis: The Funds are *not* immune from attachment under the FSIA.  Property is immune from attachment under Section 1611(b) only if it is "the property of a foreign state" that is "the property … of a foreign central bank … held for its own account."  28 U.S.C.

22

§ 1611(b). The district court's sole basis for determining that the Funds satisfied these conditions was its deference to the Executive's conclusory assertion that DAB remains the central bank of Afghanistan. But this deference was erroneous. The FSIA was enacted to shift responsibility for making determinations about foreign sovereign immunity in particular cases from the Executive to the Judiciary.

With that inappropriate deference stripped away, all that remains is Victims' undisputed evidence that the Taliban—a non-state actor—has complete control of DAB. Because DAB now is controlled by and functions as an arm of the Taliban, it can no longer be considered an "agency or instrumentality" of the sovereign state of Afghanistan. In the State Department's own telling, currently there is no recognized government of Afghanistan for DAB to serve at all. In these circumstances, Section 1611(b) cannot apply to DAB.

Regardless of DAB's sovereign status, the particular *funds* at issue also lack immunity. Central-bank funds are immune only when they are held for the bank's "own account"—that is, when they are being used for central-banking functions. The Funds were blocked to prevent misuse by the Taliban, and the Executive has since allocated the Funds to non-

23

central-banking purposes. Of course, the Funds cannot be used for central-banking functions while they are frozen. As a result, the Funds *themselves* necessarily lack immunity under Section 1611(b).

Because the district court's sole basis for vacating the attachment—FSIA immunity—was legally erroneous, the order vacating the attachment must be reversed.

## STANDARD OF REVIEW

"[L]egal conclusions under the FSIA" are reviewed "*de novo*," including "determinations that a foreign state or its property is or is not protected by immunity." *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 286 (2d Cir. 2011). "[A] district court's ruling on a request for an order of attachment" is reviewed "for abuse of discretion." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 472 (2d Cir. 2007). A "district court abuses its discretion if it applies legal standards incorrectly, relies on clearly erroneous findings of fact, or proceeds on the basis of an erroneous view of the applicable law." *Aurelius Cap. Partners, LP v. Republic of Argentina*, 584 F.3d 120, 129 (2d Cir. 2009). Where "legal conclusions that underlay the District Court's exercise of discretion to vacate the attachmen[t]" are "dispositive," namely, "that the funds were … immune

24

from attachment under the FSIA"—this Court exercises "*de novo*" review. *EM Ltd.*, 473 F.3d at 472.

## ARGUMENT

### I.    This Court Has Jurisdiction.

Contrary to the district court's suggestion, *see* AA468 & n.3, this Court's jurisdiction is clear.  Victims have Article III standing because the district court's vacatur of Victims' attachment eliminated their lien on the Funds, which constitutes a concrete injury to property that the Court can redress through reversal.  And because Victims continue to be "aggrieved" by the district court's vacatur decision, which was merged into the final judgment, there is appellate jurisdiction over Victims' appeal from final judgment.  *United States v. Vazquez*, 145 F.3d 74, 83 (2d Cir. 1998).  Alternatively, orders denying security—like the vacatur order here—are appealable interlocutory orders, and thus there is jurisdiction over the district court's vacatur decision through Victims' interlocutory appeal as well.

### A.    Victims Have Article III Standing.

Victims have standing to appeal because reversal of the vacatur order would redress the ongoing monetary injury they are suffering as a

result of that order. Victims hold a $5.2 billion judgment against the Taliban. To collect on that judgment, Victims must find and secure Taliban assets. The only Taliban assets Victims have identified in the United States are the Funds. The $1.4 billion attachment and levy of the Funds gave Victims a secured claim and "establishe[d]" Victims' "priority" to them. AA317; *see* Fed. R. Civ. P. 64; N.Y. C.P.L.R. § 5234(b). Vacatur of Victims' attachment conversely eliminated their secured claim and priority to the Funds. That is an obvious injury in fact. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("monetary injury" is "concrete injury in fact under Article III"); *LPP Mortg., Ltd. v. Brinley*, 547 F.3d 643, 648 (6th Cir. 2008) (loss of lien is Article III injury).

Without the ability to attach and execute against the Funds, let alone priority vis-à-vis other creditors, Victims might never even partially satisfy their judgment against the Taliban. Vacatur of Victims' attachment on the basis of FSIA immunity is thus a concrete injury that would be redressed by reversal.

## B. This Court Has Jurisdiction Over Victims' Appeal From Final Judgment.

Under 28 U.S.C. § 1291, the Court has jurisdiction over all appeals from final judgments, including interlocutory orders merged into those

26

judgments. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 141 n.25 (2d Cir. 2011). The Court thus has jurisdiction over Victims' appeal from final judgment in No. 23-797, and as part of that appeal, has power to review the interlocutory order vacating the attachment.

Although Victims obtained a favorable final judgment, the Supreme Court has recognized that a "party who has prevailed on the merits" may appeal an adverse "collateral" ruling "so long as that party" has Article III standing. *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 334 (1980) (permitting plaintiffs to appeal interlocutory order denying class certification even though plaintiffs had won individual judgments). "[A] prevailing party" must "show that it is aggrieved by some aspect of the trial court's judgment or decree." *In re DES Litig.*, 7 F.3d 20, 25 (2d Cir. 1993); *see also ACLU v. Dep't of Just.*, 894 F.3d 490, 494 (2d Cir. 2018). Victims have Article III standing, *see supra* Part I.A, and easily satisfy this requirement.

While courts may decline to hear appeals from prevailing parties for prudential reasons, *see Camreta v. Greene*, 563 U.S. 692, 703-05 (2011), there is no sound prudential reason to decline Victims' appeal here. Despite their default judgment, "[t]here can be no doubt" that

27

Victims are suffering a "present injury that stems from" the district
court's "adverse" collateral order vacating the attachment. *Vazquez*, 145
F.3d at 83 (permitting appeal from plaintiff who "prevailed on the merits
below" but was "aggrieved" by an interlocutory "court order"). And
"reversal" of that order would very much make a "difference to … the
financial consequences of this litigation"—equipping Victims to seek
partial satisfaction of their judgment. *DES Litig.*, 7 F.3d at 25 n.5.
Conversely, if left to stand, the vacatur threatens to render Victims' $5.2
billion judgment a nullity. The Court thus can and should review
Victims' appeal from final judgment.

## C. Alternatively, This Court Has Jurisdiction Over Victims' Interlocutory Appeal.

The Court additionally has jurisdiction through Victims' interlocu-
tory appeal of the order vacating the attachment in No. 23-354 under the
collateral-order doctrine. An interlocutory order is immediately appeal-
able under 28 U.S.C. § 1291 when it (1) "conclusively determine[s] [a]
disputed question," (2) "resolve[s] an important issue completely separate
from the merits of the action," and (3) is "effectively unreviewable on ap-
peal from a final judgment." *Kensington Int'l Ltd. v. Republic of Congo*,
461 F.3d 238, 240 (2d Cir. 2006). In the attachment context, orders

involving "serious and unsettled questions of law" are particularly appropriate for interlocutory appeal. *Banque Nordeurope S.A. v. Banker*, 970 F.2d 1129, 1131 (2d Cir. 1992) (per curiam); *see also Kensington*, 461 F.3d at 242. The district court's order vacating Victims' attachment easily meets each of those requirements.

*First*, the district court conclusively denied Victims judgment security by vacating their attachment because it determined that DAB's assets were "immune from attachment under the FSIA." AA464.

*Second*, vacatur of the attachment involves an issue of "great importance": whether the Funds—totaling $3.5 billion—are available to satisfy judgments against the Taliban. *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, 948 F.2d 111, 114 (2d Cir. 1991). That important issue is completely separate from the underlying merits of Victims' substantive claims.

*Third*, an order vacating an attachment is a "final collateral orde[r] that [is] unreviewable on appeal from a final judgment," *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 398 (2d Cir. 1995), because the funds "may not be available at a later date to satisfy a judgment," *Caribbean Trading*, 948 F.2d at 114. Victims' loss of attachment and

priority to the Funds creates a significant risk that these "limited" Taliban assets will be re-appropriated by the United States (which already took half of the blocked Funds), claimed by other Taliban creditors, or even released to the Taliban. AA317-18. Given the risks of asset dissipation, both the Supreme Court and this Court have long recognized that orders denying security are immediately appealable. *See Result Shipping Co.*, 56 F.3d at 398; *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 689 (1950); *Brastex Corp. v. Allen Int'l, Inc.*, 702 F.2d 326, 329-30 (2d Cir. 1983); *Caribbean Trading*, 948 F.2d at 114. Notably, in the very case *establishing* the collateral-order doctrine, the Supreme Court affirmed the immediate appeal of an order denying security. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 543, 546-47 (1949).

Although final judgment occurred here less than one month after Victims noticed their interlocutory appeal, that risk of dissipation remains. The district court's FSIA immunity determination presents an obstacle to Victims' ability to seek a new writ of execution against the Funds. Moreover, any new writ obtained by Victims would lack the priority of Victims' original writ. Finally, if the Court were to conclude that

the vacatur order is not reviewable on appeal from final judgment, *see supra* Part I.B, then the vacatur order would be *actually*—not just effectively—unreviewable on appeal from final judgment. That is precisely the circumstance in which the collateral-order doctrine must apply.

*Last*, this appeal presents multiple "unsettled," "important question[s] of law whose resolution w[ould] guide courts in other cases." *Dayco Corp. v. Foreign Transactions Corp.*, 705 F.2d 38, 40 (2d Cir. 1983); *Banque Nordeurope S.A.*, 970 F.2d at 1131. These issues of first impression—including whether a putative central bank taken over by a rogue terrorist regime may enjoy sovereign immunity under the FSIA—have systemic importance to the other pending and potential cases involving the Taliban's creditors, as well as FSIA doctrine more generally. The interlocutory appeal thus falls within the heartland of the collateral-order doctrine. *See Kensington*, 461 F.3d at 241.[3]

---

[3] The district court cited *Dayco* to suggest that orders denying security "ordinarily" are not immediately appealable. AA468 n.3. But *Dayco* held merely that when an interlocutory order "involves only a factual determination" and no significant "legal questions," the Court may decline to exercise jurisdiction under the collateral-order doctrine. 705 F.2d at 38-39. That limited carveout does not apply here.

31

Whether as part of the appeal from final judgment or under the collateral-order doctrine, this Court has jurisdiction to review the district court's order vacating the attachment.

## II. The District Court Erred In Vacating Victims' Attachment Of The Funds.

On the merits, as the district court recognized (and never disavowed), all requirements for attachment under New York law are satisfied. The district court vacated the attachment solely because, in its view, the Funds are immune from attachment under the FSIA. But that legal conclusion was erroneous, and the vacatur order should be reversed.

### A. Victims Satisfy All The Requirements For Prejudgment Attachment.

Under Federal Rule of Civil Procedure 64(a), Victims' attachment is governed by New York law. AA310. Article 62 of New York's Civil Practice Law and Rules provides that a plaintiff is entitled to prejudgment attachment if it can show that (1) "there is a cause of action"; (2) "it is probable that the plaintiff will succeed on the merits"; (3) "one or more grounds for attachment provided in [C.P.L.R.] section 6201 exist"; and (4) "the amount demanded from the defendant exceeds all counterclaims known to the plaintiff." N.Y. C.P.L.R. § 6212(a). Where

32

these requirements are satisfied, a district court has no "discretion … [to] permit denial of [attachment] for some other reason, at least absent extraordinary circumstances." *Cap. Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 222 (2d Cir. 2006).

As the district court concluded when it originally granted attachment, Victims readily satisfied each of those requirements. Dkt. 5, at 11-23. Victims brought—and ultimately succeeded on—multiple causes of action against the Taliban. AA311-16. "[T]he nature of the Taliban's limited assets in the United States and the potential disbursal of the [DAB] funds" confirmed Victims' need to secure their claim to those Funds. AA316-18. And there were no known counterclaims. AA318. Thus, because the district court identified no "extraordinary circumstances," it lacked discretion to deny attachment. *Cap. Ventures Int'l*, 443 F.3d at 222.

As the district court recognized, "[t]he standard for confirming an attachment order is the same as that for granting an *ex parte* order of attachment in the first instance." AA459. Confirmation simply protects the defendant when a plaintiff receives an attachment *ex parte*, and therefore imposes no additional evidentiary or legal burdens. *See* Siegel,

*supra*, § 315.  Consistent with these principles, when the district court denied Victims' confirmation motion and vacated the attachment, it did not disavow its earlier conclusion that Victims satisfied the requirements for attachment under N.Y. C.P.L.R. § 6212.  Accordingly, Victims undisputedly meet all requirements for attachment under New York law.[4]

### B.    The District Court Erred By Vacating The Attachment Under The FSIA.

Nonetheless, the district court vacated Victims' attachment because it believed that the Funds were immune from attachment under the FSIA.  AA464.  The court made three errors—enforcing immunity *sua sponte* where the Funds' sovereign status was unclear, affording conclusive deference to the Executive's views on the issue, and ultimately holding the Funds immune under the FSIA.  Each error independently warrants reversal.

---

[4] The district court noted that courts have discretion to deny attachment based on "extraordinary circumstances."  AA459 n.7 (citing *Iraq Telecom Ltd. v. IBL Bank S.A.L.*, 43 F.4th 263, 272 (2d Cir. 2022)).  But the district court identified no "extraordinary circumstances" that warranted vacatur of the attachment *other than* FSIA immunity.  AA464.

### 1. Because The Sovereign Status Of DAB Is Disputed, The District Court Erred By Enforcing Attachment Immunity *Sua Sponte*.

Throughout this litigation, Victims have maintained that the FSIA is inapplicable because the Taliban, a non-state actor, has taken over DAB, and thus no foreign state owns the Funds. *See* Dkt. 48, at 2. Until the day the district court vacated Victims' attachment, no participant in this litigation had ever contended that the FSIA precluded attachment. The Federal Reserve had tautologically suggested that the FSIA could be a "threshold" issue "to the extent" the statute applies, but its brief expressly refrained from taking any "position" on the issue. Dkt. 61, at 1, 6.

Later, however, the government filed a statement of interest at the district court's invitation contending that "the FSIA precludes confirmation." AA452. Hours later—and as Victims were formulating their response to the government's letter—the Court denied confirmation and vacated Victims' attachment under the FSIA, 28 U.S.C. § 1611(b). Citing *Walters*, the district court expressly acknowledged that it was "address[ing] the applicability of Section 1611 immunity *sua sponte*." AA461. But that was error, because *sua sponte* consideration of

immunity under Section 1611(b) is improper where—as here—the sovereign status of the property at issue is disputed.

a. The FSIA provides two types of immunity for foreign sovereigns: jurisdictional immunity and execution immunity. *See* 28 U.S.C. §§ 1330(a), 1609, 1611; *Walters*, 651 F.3d at 288. Jurisdictional immunity bars suit against a foreign sovereign, while execution immunity—the immunity at issue here—protects a foreign sovereign's assets from seizure. *See Walters*, 651 F.3d at 288. Courts must consider *jurisdictional* immunity even when it is not raised by the parties. *Id.* at 287. But *execution* immunity is not jurisdictional; it is best construed as an affirmative defense. *See Caribbean Trading*, 948 F.2d at 115 (execution immunity is "not" a "matte[r]" of "subject-matter jurisdiction" "that may be raised at any time" and late assertion may be "untimely"); *Walters*, 651 F.3d at 293 (noting arguments that execution immunity is an affirmative defense without resolving the issue).

*Walters* held that courts *may* enforce execution immunity *sua sponte* when the action involves "an *undisputed* foreign sovereign" and when the attempted collection is "against what are *undisputed* sovereign assets." 651 F.3d at 293-94 (emphases added). But *Walters* specifically

36

reserved whether a court may enforce execution immunity *sua sponte* "where … the sovereign ownership of the targeted property is *in doubt*"— precisely as it is here. *Id.* at 294 n.11 (emphasis added). Nor did *Walters* "determine the applicable burden-of-proof framework" in such circumstances "for execution immunity." *Id.*

Other circuits have gone beyond *Walters*. In *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1128 (9th Cir. 2010), the Ninth Circuit explained that it is improper for courts to enforce execution immunity *sua sponte* where the sovereign status of the property is "not clear." Where it is "not certain," or not "readily apparent that the property at issue belongs to a foreign state" and thus would be "covered by the FSIA," "a foreign state *must* make a *prima facie* case of ownership in order for the presumption of immunity to apply." *Id.* (emphasis added). In these circumstances, "[t]hird parties cannot invoke immunity on behalf of a foreign state." *Id.* (citing *Republic of Philippines v. Marcos*, 806 F.2d 344, 360 (2d Cir. 1986)); *see also Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 800 n.16 (7th Cir. 2011) (holding in related context that where a putative "foreign-state instrumentality has a questionable claim" to "immunity," and the plaintiff has not "sue[d] the foreign sovereign itself,"

37

the instrumentality itself "must establish a prima facie case that it fits the FSIA's definition of a foreign state").

b.     This Court should adopt *Peterson*'s framework, which has a long historical pedigree that predates the FSIA. *See Peterson*, 627 F.3d at 1128 n.3. Throughout their history, American courts have confronted claims of immunity for property whose sovereign status is dubious—for example, commercial ships claiming governmental status. *See The Gul Djemal*, 264 U.S. 90, 91-92 (1924); *The Pesaro*, 255 U.S. 216, 216-17 (1921). The precedent that developed was clear: to assert immunity, the foreign sovereign *itself* was required either to appear in the litigation or to use diplomatic channels to secure a suggestion of immunity through the U.S. government. *See Ex parte Muir*, 254 U.S. 522, 531-33 (1921); *The Anne*, 16 U.S. (3 Wheat.) 435, 445-46 (1818) (Story, J.); *see also Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 300 F. 891, 893-94 (S.D.N.Y. 1924) (L. Hand, J.) ("[W]hen the party before the court as claimant or as defendant is neither the sovereign nor his ambassador, it is now the established rule that the claim will not be recognized, unless by diplomatic intervention."); Jesse Andrews Raymond, *Sovereign Immunity in Modern Admiralty Law*, 9 Tex. L. Rev. 519, 530 n.26 (1931);

38

*Loomis v. Rogers*, 254 F.2d 941, 944 (D.C. Cir. 1958) (noting the requirement that there be "a formal suggestion of immunity" by the foreign sovereign "where there is a question of fact as to whether the property proceeded against is the public property of a foreign sovereign").

When the foreign sovereign *failed* to appear or claim immunity, the district court did not probe *sua sponte* potential arguments the foreign sovereign might have made. Instead, the suit simply proceeded. *See, e.g.*, *The Gul Djemal*, 264 U.S. at 95.

The FSIA preserved the principle that third parties cannot assert a disputed claim of "immunity on behalf of a foreign state." *Peterson*, 627 F.3d at 1128 & n.3. It has long been the rule that a "suggestion" of immunity from a non-party, unprompted by the foreign state itself, does not permit *sua sponte* enforcement of a non-jurisdictional immunity. *Puente v. Spanish Nat'l State*, 116 F.2d 43, 44-45 (2d Cir. 1940); *see also Marcos*, 806 F.2d at 360; *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter, Inc.*, 32 F.2d 195, 200 (2d Cir. 1929).

c. Those rules apply straightforwardly here. In light of the Taliban's takeover, the sovereign status of DAB and its funds is far from "readily apparent." *Peterson*, 627 F.3d at 1128. The district court

believed there could be no dispute over sovereign status because the property of a foreign state is "presumptively immune from attachment." AA467.  But that assumes the conclusion—that the Funds are "property of a foreign state" under Section 1611(b).  A general presumption that property of a foreign state is immune from attachment does not apply where there is a question whether particular property belongs to a foreign state in the first place.  *Peterson*, 627 F.3d at 1128.  Victims have always disputed that the Funds belong to Afghanistan.  *See, e.g.*, Dkt. 5, at 20-21.

In these circumstances, "a foreign state must make a *prima facie* case of ownership," *Peterson*, 627 F.3d at 1128, but neither Afghanistan nor DAB appeared in this action, much less presented a *prima facie* case for immunity.  The United States (at the district court's invitation) filed a letter contending that "the FSIA precludes confirmation of the Court's prejudgment attachment order."  AA452.  But where sovereign status is uncertain, third parties cannot assert immunity for an absent sovereign. *Peterson*, 627 F.3d at 1128.  Thus, it was error for the district court to enforce "Section 1611 immunity *sua sponte*," let alone at the prompting of the United States.  AA461.

40

The district court construed a line in Victims' reply to the Federal Reserve as "conce[ding]" that the court "may decide the FSIA question" at the attachment stage. AA461 (emphasis omitted) (quoting Dkt. 63, at 6); AA467 n.2. But the district court took that statement out of context. Victims' primary argument has always been that the FSIA does not apply at all. *E.g.*, Dkt. 48, at 23; Dkt. 63, at 3. Victims' secondary submission was that to the extent the court addressed the FSIA, it was irrelevant whether the court rejected immunity at the attachment stage or the execution stage, since immunity is inapplicable at either. Dkt. 48, at 23; Dkt. 63, at 6-8. Victims certainly did not concede that it was appropriate for the district court to *enforce* a putative execution immunity *sua sponte*. To the contrary, Victims argued in their reply that it would be improper to "delve into a hypothetical opposition" based on the FSIA because of the "bedrock principle" of party-presentation of issues. Dkt. 63, at 2 (citing *Sineneng-Smith*, 140 S. Ct. at 1579).

Because sovereign ownership of the Funds is disputed and far from clear, the district court erred in enforcing immunity under Section 1611(b) without a *prima facie* case of sovereign ownership advanced by DAB or Afghanistan.

41

**2. The District Court Erred In Deferring To The Executive's Assertion That The FSIA Provides Attachment Immunity For DAB's Assets.**

Even assuming the district court could enforce FSIA immunity issue *sua sponte*—and under the *Peterson* framework, it could not—its conclusion that the Funds enjoy such immunity was incorrect in any event. The district court rested its immunity determination entirely on the Executive's unsupported assertion that DAB is an "agency or instrumentality" of the sovereign state of Afghanistan—not the Taliban. AA462-63. The district court explained that no matter *what* evidence Victims presented regarding the Taliban's control, that evidence "c[ould] not change the fact" that the Executive "defines DAB as 'the Central Bank of Afghanistan.'" AA462. And the district court believed it was obliged to look "*above all* to the Executive Branch when assessing" sovereign immunity. AA463 n.10 (emphasis added).

This deference to the Executive on a question of sovereign immunity was erroneous. Not only was it improper for the United States as a third party to raise immunity, *see supra* pp. 37-40, the FSIA does not permit—and indeed was enacted to *abolish*—courts' deference to the Executive's case-by-case suggestions of immunity. While the Executive has

42

the exclusive power to *recognize* foreign governments for diplomatic purposes, *see Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015), its views on "the FSIA's reach ... merit no special deference," *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004).  To the contrary, application of the FSIA involves "pure question[s] of statutory construction ... well within the province of the Judiciary." *Id.*  And deference was "particularly inappropriate" here because the Executive's litigation position is "inconsistent" with its prior actions in re-appropriating half of the Funds and leaving the remainder available for victims of Taliban-supported terrorism.  *City of New York v. Permanent Mission of India*, 446 F.3d 365, 376 n.17 (2d Cir. 2006).

a.    The history and purposes of the FSIA illuminate the district court's error.  Prior to the FSIA, courts routinely deferred to suggestions of sovereign immunity from the Executive.  In *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116 (1812), the respondent filed a federal action to reclaim a ship that, in his view, had been illegally seized by the French military.  *Id.* at 117.  Accepting a suggestion of immunity from the Executive on behalf of the French consul, however, the Court held the ship immune from jurisdiction.  *Id.* at 119, 141.

43

This holding shaped the system of immunity that governed for the next 150 years. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). Foreign sovereigns were understood to have "virtually absolute immunity" in U.S. courts. *Id.* Because that immunity was "a matter of grace and comity rather than a constitutional requirement," courts "consistently … deferred" to the Executive about whether or not to extend immunity in a given case. *Altmann*, 541 U.S. at 689; *Verlinden*, 461 U.S. at 486. But the Executive "ordinarily requested immunity in all actions against friendly foreign sovereigns." *Verlinden*, 461 U.S. at 486.

That approach began to change in 1952. Reacting to foreign governments' increasing involvement in commercial activities, the State Department issued a letter (the well-known Tate Letter) announcing a significant change in policy—away from the "absolute" theory of immunity associated with *The Schooner Exchange* to a "restrictive" theory of immunity conferring protection only for foreign sovereigns' public acts. *Verlinden*, 461 U.S. at 486-87. As a result, the Executive no longer would honor foreign nations' requests for suggestions of immunity in cases

44

involving essentially private conduct. *Id.*; *see also Altmann*, 541 U.S. at 690.

Applying that new restrictive theory of immunity "proved troublesome." *Verlinden*, 461 U.S. at 487. Immunity was still subject to case-by-case determinations by the Executive. *Id.* But because immunity no longer was guaranteed, "foreign nations often placed diplomatic pressure on the State Department in seeking immunity." *Id.* "On occasion, political considerations led to suggestions of immunity" even in suits involving merely private acts. *Id.* It eventually "became apparent that the State Department was ill-equipped to make dispassionate legal decisions" regarding immunity, instead offering immunity suggestions on arbitrary and inconsistent bases. Kevin P. Simmons, Note, *The Foreign Sovereign Immunities Act of 1976: Giving the Plaintiff His Day in Court*, 46 Fordham L. Rev. 543, 549 (1977).

In 1976, Congress sought to "abat[e] the bedlam" and "replac[e] the old executive-driven, factor-intensive, loosely common-law-based immunity regime" with a legislative solution: the FSIA. *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141 (2014). The FSIA established a "comprehensive set of legal standards" and "vested sole responsibility

for applying those standards in the federal judiciary." *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 818 (2d Cir. 2021). The Act "remove[d] the decision as to immunity in particular cases from the executive branch," *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 253 (2d Cir. 1999), "eliminating judicial deference to executive determinations," Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*, 44 Vanderbilt J. Transnational L. 911, 920 (2011). Those changes ensured that immunity was assessed "on purely legal grounds"—rather than through "ad hoc decisions of Executive Branch officials," *Beierwaltes*, 999 F.3d at 818—thus ensuring "due process" for litigants and states, *Verlinden*, 461 U.S. at 488.

Accordingly, the FSIA requires an independent judicial assessment of an entity's sovereign immunity—an assessment on which the Executive's views "merit no special deference." *Altmann*, 541 U.S. at 701; *see also* Restatement (Fourth) of Foreign Relations Law § 452 rptr. n.1 (2023 update) ("the views of the executive branch should not control … question[s] of" immunity "under the FSIA").

b. In declining to treat the issue of FSIA immunity as a "question of statutory construction," *Altmann*, 541 U.S. at 701, the district

court disregarded these foundational principles. Instead, the district court repeatedly invoked the Executive's statements as conclusively establishing "DAB's status as Afghanistan's central bank." AA462-63. This reasoning is analytically indistinguishable from the system the FSIA was designed to replace: judicial deference to "ad hoc decisions of Executive Branch officials." *Beierwaltes*, 999 F.3d at 818.

The district court's attempt in its stay order to rehabilitate its improper deference to the Executive falls short. The court acknowledged that "the Judicial Branch" must "assess whether the FSIA applies," but posited that "the FSIA does not address the extent to which a nation or its central bank is sovereign." AA468. As in its order vacating the attachment, the court believed that the "threshold determination" of DAB's sovereignty "is soundly within the purview of the Executive Branch." AA468 (citing *Zivotofsky*, 576 U.S. at 19); *see also* AA460 n.8, AA463 n.10 (citing *Zivotofsky*, 576 U.S. at 19).

But the district court's reasoning conflates the Executive's diplomatic *recognition* of a foreign state—which *Zivotofsky* addresses—with the legal question of whether an entity is immune under the FSIA as that foreign state's agency or instrumentality. These concepts are distinct,

47

and a judicial determination that some entity is not, for purposes of FSIA immunity, a "foreign state" or its "agency" or "instrumentality"—each defined terms under the FSIA, 28 U.S.C. § 1603(a)-(b)—poses no conflict with the President's recognition of the foreign state itself.

As for *recognition*, the Executive undoubtedly "has the exclusive power," "[a]s a constitutional matter," "to recognize foreign states for diplomatic purposes." Restatement (Fourth) of Foreign Relations Law § 452 rptr. n.1; *see* U.S. Const. art. II, § 3; *Zivotofsky*, 576 U.S. at 12-13. Through this recognition power, the President may formally acknowledge "that a particular 'entity possesses the qualifications for statehood,'" "that a particular regime is the effective government of a state," or that a particular state legitimately controls certain "territorial bounds." *Zivotofsky*, 576 U.S. at 11.

By contrast, "[c]lassification as a foreign state *for FSIA purposes* is a matter of statutory interpretation." Restatement (Fourth) of Foreign Relations Law § 452 rptr. n.1 (emphasis added). On such matters of statutory interpretation, the Executive's views warrant "no special deference." *Altmann*, 541 U.S. at 701. Courts instead may "*consider* whether" the Executive has recognized some "particular territorial, political, or

48

regional body [as] a foreign state." Restatement (Fourth) of Foreign Relations Law § 452 rptr. n.1 (emphasis added). But they also consider "the criteria of statehood from international law" and "established constructions" of the FSIA to determine whether those Executive Branch definitions actually accord with the meaning of "foreign state" under the FSIA. *Id.*; *Kirschenbaum v. 650 Fifth Ave. & Related Props.* ("*Kirschenbaum I*"), 830 F.3d 107, 123-25 (2d Cir. 2016).[5]

*Kirschenbaum I* vividly illustrates these principles. There, the plaintiffs attempted to enforce judgments against Iran by executing on the assets of a foundation and partnership that Iran allegedly controlled. 830 F.3d at 117-19. The district court held the organizations immune as "foreign state[s]" under the FSIA. *Id.* at 124. In so doing, it relied (as did the district court here) on an Executive Order, which defined the "'Government of Iran' to include 'any person owned or controlled by, or acting for or on behalf of, the Government of Iran.'" *Id.* This Court reversed. It explained that "these Executive Branch definitions … cannot be used to

---

[5] The Supreme Court abrogated *Kirschenbaum I* only "to the limited extent that it treated FSIA § 1610(g) as a freestanding exception to attachment immunity." *Kirschenbaum v. Assa Corp.* ("*Kirschenbaum II*"), 934 F.3d 191, 196 n.4 (2d Cir. 2019).

expand sovereign statehood under the FSIA." *Id.* at 124-25. To the contrary, the organizations "lack[ed] the traditional attributes of statehood" and thus could not be deemed "foreign states" by executive fiat. *Id.* at 125. Because the term "foreign state" in the FSIA must be "defined according to established constructions," it is "*not* properly defined by reference to an Executive Order." *Id.* (emphasis added).

Accordingly, executive pronouncements about what constitutes a "foreign state" must be subjected to judicial scrutiny—not reflexive deference—under the FSIA, as other circuits have also concluded. *See, e.g.*, *O'Bryan v. Holy See*, 556 F.3d 361, 374 n.4 (6th Cir. 2009) ("Courts routinely determine whether incorporated entities satisfy the criteria necessary to be considered an agency or instrumentality of a recognized foreign state pursuant to 28 U.S.C. § 1603(b) without becoming entangled in [Executive recognition]."). The district court thus erred by failing to see the distinction between recognition for diplomatic purposes, where the Executive's views govern, and judicial application of the FSIA for immunity purposes, where the Executive's views are not entitled to deference. The latter determination—whether a particular entity is an agent or instrumentality of a foreign state under the FSIA—in no way disturbs the

President's "threshold" decision to recognize the state *itself* for diplomatic purposes. *Cf.* AA468.

     c.     Deference to the Executive on the "FSIA's reach" is "particularly inappropriate" here because the Executive's litigation position is at odds with its actions and policy statements. *Permanent Mission of India*, 446 F.3d at 376 n.17; *cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

     The Administration's decision to freeze the Funds and re-appropriate half of them for its own purposes strongly contradicts its litigation position that DAB is a "sovereign" entity entitled to immunity and that the Funds belong to the state of Afghanistan. Those actions were, in fact, a radical *affront* to DAB's purported sovereignty. *See, e.g.*, *Rubin*, 830 F.3d at 480 ("Seizing a foreign state's property is a serious affront to its sovereignty[.]").

     In fact, according to the State Department, since the Taliban takeover, the government does not recognize "any … entity" "as *part of* [the Government of Afghanistan]." U.S. Dep't of State, *U.S. Relations with Afghanistan*, *supra* (emphasis added). In other words, outside of this suit, the government has declined to deem DAB a sovereign entity.

The government's suggestion of immunity also contradicts its prior position that victims of terrorism could lay claim to the Funds. Executive Order 14064 itself contemplates "victims of terrorism" asserting "legal claims" against the Funds. AA234. And a Fact Sheet accompanying the Executive Order confirmed that the remaining $3.5 billion in DAB assets would be "subject to ongoing litigation by U.S. victims of terrorism," giving victims "a full opportunity to have their claims heard in court." AA301. These comments were widely understood, including by the Secretary of State, to mean that victims of terrorism could use these assets to satisfy judgments against the Taliban. *See* AA291-93 (explaining that "President Biden [wa]s starting to clear a legal path" for victims of terrorism "to pursue $3.5 billion that [DAB] had deposited in New York" and that the Administration "will not object to any court decision to devote half of the money" to such victims); Antony J. Blinken, *Executive Order to Preserve Certain Afghanistan Central Bank Assets for the Benefit of the People of Afghanistan*, U.S. Dep't of State (Feb. 11, 2022), https://www.state.gov/executive-order-to-preserve-certain-afghanistan-central-bank-assets-for-the-benefit-of-the-people-of-afghanistan/ (stating that "[t]his Administration will continue to support" "victims of

terrorism" "pursuing [DAB's] remaining assets in federal court"). These statements are incompatible with the government's litigation position that the Funds are immune assets of a sovereign's central bank.

The government has made no effort to reconcile its litigation position with Executive Order 14064 and the Administration's accompanying statements, and the district court failed even to recognize the contradictions. It was "particularly inappropriate" for the court to uncritically accept a suggestion of FSIA immunity that the Executive's own actions undermine. *Permanent Mission of India*, 446 F.3d at 376 n.17.

### 3. The Undisputed Facts Demonstrate That The Funds Are Not Immune From Attachment Under The FSIA.

In the absence of unwarranted and uncritical deference to the government's conclusory assertions, the undisputed facts support only one conclusion: Section 1611(b) confers no immunity for the Funds.

Immunity under Section 1611(b) applies only to "the property of a foreign state" that is "the property … of a foreign central bank … held for its own account." 28 U.S.C. § 1611(b). The Funds are not "the property of a foreign state" (nor "the property … of a foreign central bank") because DAB is no longer an "agency or instrumentality" of Afghanistan.

28 U.S.C. §§ 1603(b), 1611(b).  Moreover, the Funds are not being held for DAB's "own account" because those Funds ceased "being used for central banking functions as such functions are normally understood," *NML Cap., Ltd. v. Banco Cent. de la Republica Arg.*, 652 F.3d 172, 194 (2d Cir. 2011), as soon as the Taliban took over DAB and DAB ceased performing central-banking functions.  Moreover, since the President blocked the Funds by Executive Order 14064, they cannot be used by DAB for central-banking functions at all.  Thus, the Funds are not immune under Section 1611(b).  *See id.*

a.    Citing *NML Capital*, the district court assumed that because the Funds are "held … in the name of a central bank," *i.e.*, DAB, they are presumptively immune under Section 1611(b)(1).  AA461-62.  But that assumption missed a critical step: determining whether, as an initial matter, the frozen Funds are even "the property of a foreign state" under Section 1611(b).  This Court expressly took *that* question for granted in *NML Capital*, since it was undisputed there that Argentina's central bank was a "foreign stat[e]" entity within the meaning of the FSIA.  652 F.3d at 186 n.16.  But that point *is* disputed here and is a "threshold question" that must be established for the FSIA to even apply.

*Kirschenbaum I*, 830 F.3d at 123; *see also S & S Mach. Co. v. Masinex-portimport*, 706 F.2d 411, 413 (2d Cir. 1983). If the district court had properly conducted that initial inquiry, the answer would have been clear: the Funds are not "the property of a foreign state" because DAB is no longer an agency or instrumentality of Afghanistan.

The FSIA defines "foreign state" to include "an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a), and further defines "an agency or instrumentality of a foreign state" as (among other criteria) "any entity" "which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," *id.* § 1603(b)(2). Under the Afghanistan banking law that originally created DAB, DAB is supposed to be "entirely independent"; it does not have or issue ownership shares, so the second part of this definition is inapplicable. Afghanistan Bank Law, art. 3.3 (Dec. 17, 2003), https://dab.gov.af/sites/default/files/2018-12/DABLaw1English_2.pdf. Thus, the key question is whether DAB, at the time of Victims' attachment proceeding, was an "organ" of Afghanistan. *See Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 84 (2d Cir. 2014) (immunity is assessed "when the

55

writ of attachment or execution issues"); *Aurelius Cap. Partners, LP*, 584 F.3d at 130 (same).

The government baldly asserted that DAB "is an agency or instrumentality of the state of Afghanistan" by relying on generic precedent that "[s]tate-owned central banks" constitute an "agency or instrumentality" under the FSIA, AA451 (quoting *EM Ltd.*, 473 F.3d at 472), and the district court uncritically accepted that assertion, AA462. But neither the government nor the district court ever independently analyzed whether DAB met the FSIA's definition of agency or instrumentality, particularly whether DAB is still "an organ of [Afghanistan]," 28 U.S.C. § 1603(b)(2), at the time of the attachment proceeding. The district court's failure to assess whether DAB *remained* an agency or instrumentality of Afghanistan in 2022 after the Taliban's takeover was legal error.

*First*, to be an "agency" or "instrumentality," DAB must be an organ of a "foreign state," to wit, Afghanistan. But the United States does not currently recognize "any … entity as the Government of Afghanistan or as part of such a government." U.S. Dep't of State, *U.S. Relations with Afghanistan*, *supra*. There accordingly is no basis—and it is entirely contradictory—for the United States to even suggest that DAB could be a

56

sovereign "organ" of Afghanistan.[6]

*Second*, even if there were a functioning government of Afghanistan, whether an entity qualifies as an "organ" of a foreign state depends, among other things, on "whether the foreign state actively supervises the entity." *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (quoting *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (5th Cir. 2000)). There is no basis to conclude that the defunct government of Afghanistan supervises DAB today.[7]

---

[6] There also is good reason to conclude that Afghanistan no longer qualifies as a "foreign state" for purposes of the FSIA. "[T]his Court has limited the definition of 'state' to 'entit[ies] that … [are] *under the control of [their] own government*, and that engag[e] in, or ha[ve] the capacity to engage in, formal relations with other such entities.'" *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 47 (2d Cir. 1991) (emphasis added) (citation omitted). Here, it is impossible to "demonstrate that the State of [Afghanistan] is under the control of its own government," or can engage in formal relations, since the government of Afghanistan is defunct. *Id.* at 48.

[7] Other criteria include: "whether the foreign state created the entity for a national purpose;" "whether the foreign state requires the hiring of public employees and pays their salaries;" "whether the entity holds exclusive rights to some right in the [foreign] country;" and "how the entity is treated under foreign state law." *Filler*, 378 F.3d at 217. To the extent these factors look to current—rather than historical—circumstances, it is doubtful any still are satisfied. For example, given the Taliban's takeover of Afghanistan, control of DAB, and corresponding ouster of Afghanistan officials, AA403, 407-08, there is no evidence that the non-

57

Instead, Victims presented overwhelming evidence that the Taliban directly controls and supervises DAB. There is no factual dispute about Victims' evidence, which was uncontested, and which the court "assumed to be true." AA455 n.1. The district court expressly acknowledged that it had "*no reason* to second-guess the facts as relayed by those experts." AA461 (emphasis added). This undisputed evidence is that:

*The Taliban has installed its own leaders—including named terrorists—to head DAB.* After driving out DAB's formerly independent personnel, AA410, ¶ 58, the Taliban installed *multiple* of its own (unqualified) personnel to helm the top positions at DAB. For instance, in August 2021, "the Taliban appointed ... Idris" as DAB's "Acting Governor." AA408, ¶ 48. Idris is a "loyalist to the Taliban" who has no "background in [formal] banking or finance," AA408, ¶ 49, but previously led the "Taliban's finance commission," which collected "money from narcotics trafficking and illegal taxes from businesses and farmers to fund the Taliban's insurgency," AA338-39, ¶ 55. According to Afghanistan's banking law (insofar as it still applies), the governor chairs DAB's Supreme

---

operational state of Afghanistan is paying the salaries of Taliban leaders at DAB.

Council and has "the authority to take all actions required for the admin-istration or operations of [DAB]." Afghanistan Bank Law, arts. 7.1, 19.1. By appointing Idris, the Taliban thus gained direct control over DAB.[8]

The Taliban also installed Agha as DAB's first deputy governor. AA408, ¶ 51. Agha, who previously coordinated financing for bombmak-ing and other terrorist activities, has been a Specially Designated Global Terrorist for over a decade. AA409, ¶¶ 52-53. Ironically, though, Agha now oversees DAB's "regulations designed to combat the financing of ter-rorism." AA409, ¶ 54.

Under Afghanistan's banking law, DAB's governor and first deputy governor are supposed to "be appointed by a decree of the President of Afghanistan"; should "have a degree of higher education or extensive

---

[8] Since the district court's decision, "the Taliban announced Mullah Hi-dayatullah Badri, also known as Gul Agha Ishakzai, as the new governor of Da Afghanistan Bank." Badri, who "previously served as the Taliban's finance minister," "is accused of raising funds for suicide attacks in Kan-dahar and distributing money among Taliban fighters and their families. Since July 2010, he has been sanctioned [as] a Specially Designated Global Terrorist by [OFAC] due to his role as a financier for the Taliban; he also has been sanctioned by the UN Security Council since July 2010." Special Inspector General for Afghanistan Reconstruction, Quarterly Re-port to the United States Congress 62 (Apr. 30, 2023), https://www.si-gar.mil/pdf/quarterlyreports/2023-04-30qr.pdf.

work experience preferably in economics, banking or law"; and are ineligible to serve if they have "engaged in significant violations of the law." Afghanistan Bank Law, arts. 11, 20.2, 20.3. Both Idris and Agha flout these requirements.

In addition, the Taliban installed Baseer—a Specially Designated Global Terrorist since 2018 given his military and finance roles in the Taliban—as DAB's second deputy governor. AA409-10, ¶¶ 55-57. Simultaneously, the Taliban "fired thirteen high-ranking officials including the director-general of information technology, the deputy-director of banking operations, the director-general of zone coordination, the director of international relations, and the head of the payment system" from DAB. AA410, ¶ 58. "[A]ny remaining DAB personnel who are not directly affiliated with the Taliban are nonetheless subject to intimidation and subjugation, preventing them from acting independently." AA443, ¶ 47. The Taliban has banned women from working at DAB and mandated that employees grow beards and pray five times a day. AA443, ¶ 46; AA413, ¶¶ 64-65. And the Taliban flag now flies at DAB meetings:



AA412, ¶ 62 n.64 (citing Twitter link with image). The Taliban's person-

nel takeover of DAB alone demonstrates that Afghanistan is no longer

"actively supervising" DAB. *See also Filler*, 378 F.3d at 217 (organ anal-

ysis includes "hiring of public employees").

*The Taliban directs DAB through the Taliban's Economic Commis-*

*sion*. In addition to installing Taliban personnel to helm DAB, AA408-

10, ¶¶ 48-57, "the Taliban directly controls DAB decision-making via the

[Taliban's] Economic Commission," AA411, ¶ 60. This Economic Com-

mission (which is not provided for in Afghanistan's banking law and is

itself directed by the Taliban's Council of Ministers) has issued direct commands to DAB on economic issues like currency depreciation, AA411, ¶ 60; AA356, ¶ 92; AA374, ¶ 139, violating the requirement that DAB "be entirely independent in the pursuit of its objectives," Afghanistan Banking Law, art. 3.3. DAB's adherence to directives from the Taliban's Economic Commission "undermines any pretense that DAB operates independently of Taliban control." AA356-57, ¶ 92; *see also Filler*, 378 F.3d at 217 (organ analysis includes "how the entity is treated").

*The Taliban is replacing Afghanistan's Banking Law with strict Islamic banking rules*. The Taliban has ordered DAB to eliminate its modern banking framework "and replace it with traditional Islamic banking, which has stringent limitations on loans and credits." AA413-14, ¶ 66. DAB, in turn, ordered Afghanistan's commercial banks to do the same. AA413-14, ¶ 66.

*The Taliban uses DAB for its material benefit*. The Taliban's leadership and physical occupation of DAB allows the Taliban to redirect DAB and Afghanistan's financial system more broadly for its own ends. AA441, ¶ 40. Most notably, the Taliban's control of DAB has "supercharg[ed]" its ability to engage in money laundering and conceal terrorist

financing transactions. AA379, ¶ 155; AA385, ¶ 163. For example, the Taliban, "whose 'single largest source of income' is the illicit drug trade," AA378, ¶ 152, and which has long "taxed" illegal narcotics, can now deposit these "taxes" into "DAB as legitimate government revenues," AA446, ¶ 57. More generally, the Taliban's "control of DAB" "allow[s] it to launder money from any source," by "[d]epositing such funds in DAB" and "mingl[ing] them with more legitimate funds." AA446, ¶ 58; *see* AA419, ¶ 82. "Through DAB" and its "licensing function," "the Taliban can exert control over and extort any entities wishing to operate in Afghanistan, including banks, licensed [informal bankers], and NGOs or charities, forcing them to cooperate with, or at least turn a blind eye to, transfers of funds to narcotics and/or terrorist operations." AA444-45, ¶ 52. In this way, the Taliban "uses DAB and DAB's funds to support the Taliban and finance terrorism." AA432, ¶ 12.

*DAB is no longer performing central-banking functions*. Under the Taliban regime, banking "functions" have "atroph[ied] or [al]together disappear[ed]." AA411, ¶ 59; AA360-61, ¶ 102. The Taliban has discontinued DAB's former efforts to carry out AML/CFT programs. AA421, ¶¶ 88-89]. FinTRACA, the financial-intelligence arm of DAB, "is non-

63

operational" and has been suspended from the international government-intelligence-sharing platform. AA414, ¶ 67; AA425, ¶¶ 98-99. "The Taliban's current control" of DAB has stymied DAB's prior efforts to use licensing "to track the illicit uses of … *hawala*," an informal financing network frequently used by terrorists. AA434-35, ¶ 18; AA444-45, ¶ 52.

"DAB is unable to print afghanis, and it is unclear whether it will be able to obtain more." AA414, ¶ 67. Previously, DAB held dollar auctions to "suppor[t] the value of the afghani" and inject cash into the economy, "but those auctions have been curtailed," given DAB's now-limited ability to access U.S. dollars. AA414, ¶ 67; *see* AA443-44, ¶ 48.

Transactions that normally would flow through a central bank—including the receipt of foreign aid—"are being routed" around DAB. AA418-19, ¶ 81. Millions of dollars of foreign currency—including from the United Nations and World Bank—are being transferred to private banks in Afghanistan, rather than going through DAB. AA416-17, ¶ 76.

Numerous experts, officials, and policymakers have declared the need for a legitimate, independent central bank in Afghanistan. *See* AA361, ¶ 104; AA372-74, ¶ 138; AA415, ¶ 71. So too has the Executive: The Departments of State and Treasury have observed that DAB has not

"demonstrate[d] that it has the expertise, capacity, and independence to responsibly perform the duties of a central bank," nor that "it is free from political interference [or] has appropriate AML/CFT controls in place." U.S. Embassy in Afghanistan, *Joint State-Treasury Statement: The Afghan Fund* (Sept. 13, 2022), https://af.usembassy.gov/joint-state-treasury-statement-the-afghan-fund/.

In light of this overwhelming undisputed evidence, it cannot be seriously contended that the state of Afghanistan "actively supervises" DAB and thus that DAB is currently an "organ" of Afghanistan. *Filler*, 378 F.3d at 217. While application of the *Filler* factors is a "balancing process," *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 85 (2d Cir. 2008), *abrogated on other grounds by Samantar v. Yousuf*, 560 U.S. 305 (2010), here, the Taliban's complete control of DAB and corresponding disregard of Afghanistan's banking law should outweigh any reliance on Afghanistan's original creation of DAB or prior governmental status under Afghan law, *see Filler*, 378 F.3d at 217 (discussing these factors).

Instead, the evidence demonstrates that DAB today operates as an arm of the Taliban, and the district court legally erred in suggesting

65

otherwise.  AA462 & n.9; *Kirschenbaum II*, 934 F.3d at 197 (alter ego determination is legal question).  Given the Taliban's takeover of Afghanistan and its ouster of the previously recognized government, DAB cannot serve as both an arm of the Taliban and an instrumentality of Afghanistan.  It is axiomatic that "no man can serve two masters." *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976) (citation omitted); *see also* Restatement (Second) of Agency § 226 cmt. a (1958) (agent "cannot be a servant of two masters … [where] an intent to serve one necessarily excludes an intent to serve the other"); *id.* § 394 ("an agent is subject to a duty not to act or to agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed"); *see also* Restatement (Third) of Agency § 3.14 cmt. b (2006) (similar).

By mistaking DAB as an "agency or instrumentality" of Afghanistan, the district court erred in applying Section 1611(b) immunity as a threshold matter.  AA462.

b.     But even if DAB still could be considered, as the United States asserted, the central bank of Afghanistan, the district court separately erred in concluding that Victims failed to demonstrate that Section

66

1611(b)(1) did not apply. The court correctly explained (at AA461, 463) that Victims could rebut any presumed immunity by showing that the Funds are not "held for [DAB's] own account," 28 U.S.C. § 1611(b)(1), that is, "not being used for central banking functions as such functions are normally understood," *NML Cap.*, 652 F.3d at 194. But the district court failed to actually apply this test, relying instead on the government's "reaffirm[ation]" that DAB is "a sovereign agency or instrumentality entitled to immunity." AA463. That uncritical deference was erroneous for the reasons discussed. *See supra* Part II.B.2. But it also does not address the relevant question: Even if the Executive were correct that DAB itself is the arm of a foreign state, that does not answer whether "the specific Funds at issue"—*i.e.*, the funds frozen in New York—are being used for central-banking functions. AA463; *see NML Cap.*, 652 F.3d at 194.

The district court posited that the Taliban does not direct "how the specific Funds at issue … are being used," given that they "remain frozen" in New York. AA463. But that is not the legal inquiry; what matters is how *DAB* uses those Funds. And the district court made no attempt to explain how, after the Taliban takeover of Afghanistan, DAB

67

is using the Funds "for central banking functions as such functions are normally understood." *NML Cap.*, 652 F.3d at 197. Nor did the court or the United States explain on what basis President Biden blocked the Funds if DAB was using them for lawful banking functions. *Cf. Peterson v. Islamic Republic of Iran*, 2013 WL 1155576, at *26 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014).

Though this Court has not propounded a "definitive list of activities 'normally understood' to be central banking functions," "even in unusual circumstances it is not difficult to tell" whether a "function [is] characteristic of central banks." *NML Cap.*, 652 F.3d at 194 n.20. Courts and commentators have settled on a common list of activities characteristic of central banks, including issuing and redeeming bonds, issuing legal tender, maintaining monetary reserves, controlling the money supply, regulating credit, and supervising other banks. *See Bank of China v. Wells Fargo Bank & Union Tr. Co.*, 209 F.2d 467, 473-74 (9th Cir. 1953); *Republic of Panama v. Republic Nat'l Bank of N.Y.*, 681 F. Supp. 1066, 1073-74 (S.D.N.Y. 1988); *see also* Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265, 274 (1982) (compiling similar list of activities);

68

Central Bank, *Black's Law Dictionary* 177 (11th ed. 2019) ("A central bank normally issues currency, functions as the government's bank, regulates the credit system, provides oversight for commercial banks, manages exchange reserves, and implements monetary policy.").

Under those well-established definitions, since the Taliban takeover, the Funds plainly have not been used for "central banking functions" under any "norma[l]" understanding of that term. *NML Cap.*, 652 F.3d at 197. The district court suggested in passing that the frozen Funds constitute "reserves abroad." AA463. Central banks use reserves to make loans to commercial banks, to regulate interest rates by repurchasing government bonds, and to regulate the money supply and combat deflation. *See, e.g.*, William Bateman & Jason Allen, *The Law of Central Bank Reserve Creation*, 85 Modern L. Rev. 401, 404-11 (2022).

Before the Taliban takeover, DAB in fact used its funds at the Federal Reserve periodically to "hold [d]ollar auctions" to inject cash and bring stability to the "Afghan economy." AA440, ¶ 33. But after the Taliban takeover of DAB, because DAB was not permitted to access the Funds, the dollar auctions were "curtailed." AA414, ¶ 67. And now that the Funds are "frozen," DAB obviously "is unable to use" them "for

[d]ollar auctions." AA443-44, ¶ 48. Instead, they are blocked at the Federal Reserve and inaccessible for *any* purpose. Plainly, the blocked funds are not currently being "used" as "reserves." Because the frozen Funds are not being used for central-banking functions, they lack immunity under Section 1611(b)(1), whether or not DAB remains a sovereign entity more generally.

Notably, that conclusion involves no encroachment on the President's recognition power. The determination that the Funds are not being used for central-banking functions has nothing to do with whether the President chooses to recognize the state of Afghanistan for diplomatic purposes, nor even whether DAB is "Afghanistan's central bank." AA462. It simply means that the specific property at issue is not being used for a protected purpose. The district court erred, therefore, in suggesting that it would violate the separation of powers to hold that funds frozen in New York are not entitled to immunity. AA463 & n.10.

In denying a stay, the district court expressed concern about entangling courts in "pay[ing] the Taliban's debts with assets of the Afghan people that the Taliban has stolen." AA468. But the premise that Victims seek to co-opt the assets of the "Afghan people" is factually incorrect.

70

The assets in question never belonged to the "Afghan people."  They belonged to DAB and were "for its own account."  28 U.S.C. § 1611(b)(1); AA414, ¶ 67; Afghanistan Banking Law, arts. 70, 72, 76, 78.

In addition, the district court's suggestion that "the Taliban has stolen" the Funds, AA468, effectively concedes the premise the President embraced in Executive Order 14064 but the district court otherwise resists:  The Funds are currently assets of the Taliban, a non-state actor. No one condones the evil the Taliban has wrought—least of all Victims, who have experienced it firsthand.  But if the question is whether Victims can attach the Funds to obtain relief for the Taliban's heinous acts of terrorism, or whether the Taliban can retain the funds for future illicit activity, the answer should be clear.  The court cited no authority—and Victims are aware of none—for the proposition that ill-gotten gains are immune from attachment under New York law.  Just as the Funds were re-appropriated by the United States for its own foreign-policy purposes, by the same lights they also ought to be subject to attachment and execution by the Taliban's creditors—including victims of terrorism.  The district court's freewheeling equitable concerns cannot justify its decision to immunize the Funds under the FSIA.

Because the blocked Funds are not the property of a sovereign state and in any event are not being used for central-banking functions, they are not immune from attachment under the FSIA. The district court's holding to the contrary was legal error.

## CONCLUSION

This Court should reverse the district court's February 24, 2023 order vacating Victims' prejudgment attachment of the blocked Funds.

Dated:  June 30, 2023

Respectfully submitted,

/s/ *Matthew D. McGill*

Clifton S. Elgarten
Emily M. Alban
CROWELL & MORING LLP
1001 Pennsylvania Ave. N.W.
Washington, D.C. 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
celgarten@crowell.com
ealban@crowell.com

Matthew D. McGill
   *Counsel of Record*
Jessica L. Wagner
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9522
mmcgill@gibsondunn.com
jwagner@gibsondunn.com

Jane Carol Norman
BOND & NORMAN LAW, PC
6205 Executive Blvd.
Rockville, MD 20852
Telephone:  (202) 682-4100
Facsimile:  (202) 207-1041
jnorman425@icloud.com

Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-5236
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.     This motion complies with the type-volume limitation of Circuit Rule 32.1(a)(4)(A) because it contains 13,948 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2.     This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

Dated: June 30, 2023                                    By: */s/ Matthew D. McGill*
                                                                         Matthew D. McGill

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, I caused the foregoing Opening Brief of Plaintiffs-Appellants to be filed with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system and served on all counsel of record via CM/ECF.

Dated: June 30, 2023             By: */s/ Matthew D. McGill*
                                                  Matthew D. McGill