## MOTION INFORMATION STATEMENT

Docket Number(s): 23-354 (L) _____     _____ Caption [use short title] _____

Motion for: Leave to File Brief as Amicus Curiae

_____

_____

Set forth below precise, complete statement of relief sought:

Movants Afghan and Afghan-American civil society organizations

seek leave to file an amicus curiae brief in support of affirmance.

_____

_____

_____

_____

_____

James Owens, et al., v. The Taliban, et al.

MOVING PARTY: Amicus Curiae                OPPOSING PARTY: James Owens, et al.

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner   ☐ Appellee/Respondent

MOVING ATTORNEY: Katherine Gallagher      OPPOSING ATTORNEY: Matthew D. McGill

[name of attorney, with firm, address, phone number and e-mail]

Center for Constitutional Rights          Gibson, Dunn & Crutcher LLP

666 Broadway, 7th Floor, New York, NY 10012      1050 Connecticut Avenue, N.W., Washington, D.C. 20036

212-614-6464 / kgallagher@ccrjustice.org      mmcgill@gibsondunn.com/202-955-8500

Court- Judge/ Agency appealed from: Hon. Valerie E. Caproni / United States Disctrict Court for the Southern District of New York

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain): _____

_____

Opposing counsel's position on motion:
☑ Unopposed  ☐ Opposed  ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes   ☐ No   ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes  ☐ No
Has this relief been previously sought in this court?  ☐ Yes ☐ No
Requested return date and explanation of emergency: _____

_____

_____

_____

_____

Is oral argument on motion requested?    ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No If yes, enter date:_____

**Signature of Moving Attorney:**

/s/ Katherine Gallagher      Date: Oct. 6, 2023      Service by: ☑ CM/ECF  ☐ Other [Attach proof of service]

# 23-354(L)

**23-797(C)**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔒𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE SECOND CIRCUIT

---

ESTATE OF JESSE NATHANAEL ALIGANGA, ET AL.,

JAMES OWENS, ET AL.,

*Plaintiffs-Appellants*,

*v.*

TALIBAN,

*Defendant-Appellee*,

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Hon. Valerie E. Caproni
Case No. 1:22-cv-1949

---

**MOTION OF *AMICI CURIAE* AFGHAN AND AFGHAN-AMERICAN CIVIL SOCIETY ORGANIZATIONS: TRANSITIONAL JUSTICE COORDINATION GROUP, RAWADARI, WOMEN'S FORUM ON AFGHANISTAN, ET AL., FOR LEAVE TO FILE BRIEF SUPPORTING AFFIRMANCE**

Katherine Gallagher
Sadaf Doost
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Fl.
New York, NY 10012
Phone: (212) 614-6464

Pursuant to Federal Rule of Appellate Procedure 29(a)(3) and Local Rule 29.1, *Amici Curiae* Afghan and Afghan-American Civil Society Organizations, the Transitional Justice Coordination Group, Rawadari, the Women's Forum on Afghanistan, Global Advocates for Afghanistan, Project ANAR (Afghan Network for Advocacy and Resources), Afghans for a Better Tomorrow, and the Afghan-American Community Organization, respectfully move this Court for leave to file a brief as *Amici Curiae* in support of affirmance in the above captioned case. A copy of the proposed Brief accompanies this Motion.[1]

*Amici Curiae* are Afghan and Afghan-American civil society and grassroots organizations undertaking human rights, legal, advocacy, and humanitarian aid efforts in and for Afghanistan and its people, including in response to the Taliban takeover of Afghanistan in August 2021 and while in exile. In a case that raises significant economic, geopolitical, and jurisprudential matters, proposed *Amici Curiae* bring a critical perspective otherwise not directly before the court: the interests of Afghan people. *Amici Curiae*, and especially the Afghan civil society organizations, have committed many years to documenting abuses against and advancing the rights of Afghans – including women and girls, ethnic and religious

---

[1] No party or party's counsel authored this brief in whole or in part and no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. The *Owens* Plaintiffs-Appellants have consented to the filing of this brief.

minorities, human rights defenders, journalists, and educators – before the United Nations, human rights treaty bodies, and the Afghan government and judiciary, among other fora. *See Sec. & Exch. Comm'n v. Ripple Labs, Inc.,* No. 20-cv-10832 (AT), 2021 WL 4555352, at *5 (S.D.N.Y. Oct. 4, 2021) (citations omitted) (participation as *Amicus Curiae* is appropriate when "the amicus has unique information or perspective that can help the court").

The accompanying Brief does not seek to create or enlarge issues, but rather to highlight for the Court certain omitted analysis, responses or nuances in the arguments already before it with regard to the distinction in public international law between a State and its government; the origins and importance of foreign sovereign immunity, including for central banks, under international and U.S. law; and with regard to property interest and ownership as related to the application of the FSIA, Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611. The brief explains why the District Court's decision as to attachment of Da Afghanistan Bank ("DAB") assets to satisfy any judgments against the Taliban should be affirmed, namely, that DAB is the central bank of Afghanistan, and as such, is immune from execution. The Brief explains why central bank funds have received heightened protections from enforcement actions in foreign courts, and why those funds are so necessary for the people of Afghanistan in the current humanitarian and human rights crisis they face.

As Afghan and Afghan-American civil society organizations, *Amici Curiae* have a direct and deep interest in the outcome of this proceeding: to ensure that the remaining $3.5 billion in assets of Afghanistan's central bank, DAB, currently held in the United States as sovereign funds, are to remain available to be used for the people of Afghanistan to prevent further deterioration of the economic, humanitarian, and human rights circumstances of Afghanistan and Afghan civilians. Relieving the Taliban – a non-state entity – of its financial responsibility for its heinous crimes by punishing the sovereign Afghan people suffering under Taliban rule would produce a tragic injustice.

*Amici Curiae* would like to make clear that they do not challenge the judgment rendered in favor of the Plaintiffs-Appellants, nor do they question the Plaintiff-Appellants' right to compensation. *Amici* support the Plaintiffs-Appellants' efforts to collect duly-authorized judgments against defendants, including the Taliban, whose crimes caused grievous suffering. *Amici* cannot, however, support the manner in which Plaintiffs-Appellants move this Court to do so, namely by taking sovereign assets from Afghanistan's central bank; these assets belong to the State of Afghanistan, and ultimately to and are for the people of Afghanistan, not the Taliban. The Taliban bears responsibility for payment of any and all judgments against it, but satisfaction of a judgment for its crimes cannot – and should not – come from the people of Afghanistan.

In addition, nothing in this Motion or in the accompanying Brief should be read as a position affirming the legitimacy of the *de facto* authority, the Taliban.

Accordingly, *Amici* respectfully request that the Court grant this Motion for Leave and accept the accompanying Brief, which will aid it in resolving the present matter, while offering a distinct perspective of the interests of the Afghan people, including information as to the human rights and humanitarian catastrophe impacting millions in the country. *See, e.g.*, *Soos v. Cuomo*, 470 F. Supp. 3d 268, 284 (N.D.N.Y. 2020) (citation omitted) ("The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties").

Dated: October 6, 2023   Respectfully submitted,

*/s/ Katherine Gallagher*
Katherine Gallagher (KG-2222)
Sadaf Doost
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY 10012

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.  This document complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) and Local Civil Rule 27.1(a)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 811 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and Local Civil Rule 27.1(a)(1) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) and Local Civil Rule 27.1(a)(1) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: October 6, 2023          */s/Katherine Gallagher*
                                          Katherine Gallagher
                                          Sadaf Doost
                                          CENTER FOR CONSTITUTIONAL RIGHTS
                                          666 Broadway, 7th Floor
                                          New York, NY 10012
                                          Tel./Fax: (212) 614-6464

                                          *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 6, 2023, I electronically filed the foregoing Motion of *Amici Curiae* Afghan and Afghan-American Civil Society Organizations: Rawadari, Transitional Justice Coordination Group, Women's Forum on Afghanistan, et al. for Leave to File Brief Supporting Affirmance with the Clerk of the Court of the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system and served on all counsel of record via CM/ECF.

Dated: October 6, 2023          /s/Katherine Gallagher
                                Katherine Gallagher
                                Sadaf Doost
                                CENTER FOR CONSTITUTIONAL RIGHTS
                                666 Broadway, 7th Floor
                                New York, NY 10012
                                Tel./Fax: (212) 614-6464

                                *Counsel for Amici Curiae*

# 23-354(L)

**23-797(C)**

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

## FOR THE SECOND CIRCUIT

ESTATE OF JESSE NATHANAEL ALIGANGA, ET AL.,

JAMES OWENS, ET AL.,

*Plaintiffs-Appellants*,

*v.*

TALIBAN,

*Defendant-Appellee*,

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Hon. Valerie E. Caproni
Case No. 1:22-cv-1949

---

**BRIEF OF *AMICI CURIAE* AFGHAN AND AFGHAN-AMERICAN CIVIL
SOCIETY ORGANIZATIONS: TRANSITIONAL JUSTICE
COORDINATION GROUP, RAWADARI, WOMEN'S FORUM ON
AFGHANISTAN ET AL, IN SUPPORT OF AFFIRMING VACATUR OF
PREJUDGMENT ATTACHMENT**

Katherine Gallagher
Sadaf Doost
CENTER FOR CONSTITUTIONAL RIGHTS
666 BROADWAY, 7TH FL.
NEW YORK, NY 10012
Phone: (212) 614-6464

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTEREST OF *AMICI CURIAE* .......................................................... vii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

BACKGROUND ...................................................................................5

    A.  THE TALIBAN TAKEOVER, CONTINUED PERPETUATION OF THE HUMAN RIGHTS AND HUMANITARIAN CRISIS, AND IMPACT OF U.S. ACTIONS TOWARDS DAB ASSETS.................................................5

    B.  THE JUDGMENT DEBTOR....................................................12

    C.  VIEWS OF THE UNITED STATES..........................................13

ARGUMENT .....................................................................................14

    I.  UNDER FUNDAMENTAL PRINCIPLES OF U.S. FOREIGN RELATIONS AND INTERNATIONAL LAW, ASSETS OF THE DAB, AS AN AGENCY OF AFGHANISTAN, ARE PROTECTED SOVEREIGN ASSETS FOR THE STATE AND ITS PEOPLE, NOT THE TALIBAN. ...........................14

    A.  THE STATE OF AFGHANISTAN, AND ITS AGENCY DAB, NOT THE TALIBAN, IS THE SOVEREIGN ENTITY OF AFGHANISTAN. ...............................................................................15

    B.  PRINCIPLES OF FOREIGN SOVEREIGN IMMUNITY PROTECT THE SOVEREIGN PROPERTY OF AFGHANISTAN, INCLUDING DAB, FROM ATTACHMENT AND TURNOVER IN U.S. COURTS. ............18

    C.  DAB IS AN AGENCY/INSTRUMENTALITY OF THE SOVEREIGN STATE AND IMMUNE FROM JUDICIAL PROCESS IN U.S. COURTS. ..............................................................................22

    D.  TITLE OVER DAB'S ASSETS WAS UNAFFECTED BY THE TALIBAN TAKEOVER AND THEY REMAIN ASSETS OF THE SOVEREIGN – NOT THE TALIBAN.....................................................25

CONCLUSION ...................................................................................28

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS..........29

CERTIFICATE OF SERVICE ..............................................................30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428 (1989)...................................................................27

*Baker v. Carr*,
369 U.S. 186 (1962) .................................................................17

*Bank of N.Y. v. Nickel*,
789 N.Y.S. 2d 95 (N.Y. App. Div. 2004)................................26

*Bank Markazi v. Peterson*,
578 U.S. 212 (2016)..................................................................24

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
945 F.3d 1270 (10th Cir. 2019) ...............................................23

*EM Ltd. v. Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007) .....................................................24

*Gates v. Syrian Arab Republic*,
No. 11 C 8715, 2013 WL 1337223 (Mar. 29, 2013) ................21

*Guar. Tr. Co. v. United States*,
304 U.S. 126 (1938)..................................................................17

*Hausler v. JP Morgan Chase Bank, N.A.*,
770 F.3d 207 (2d. Cir. 2014) ....................................................26

*Heiser v. Islamic Republic of Iran*,
735 F.3d 934 (D.C. Cir. 2013)............................................26, 27

*Murray v. The Schooner Charming Betsy*,
2 Cranch 64 (1804) ...................................................................21

*Nat'l City Bank v. Republic of China*,
348 U.S. 356 (1955)..................................................................17

*NML Capital, LTD v. Banco Central de la Republica Argentina*,
652 F.3d 172 (2d Cir. 2011) .....................................................23

*The Paquete Habana,*
　　175 U.S. 677 (1900).........................................................................14

*Permanent Mission of India to United Nations v. City of New York,*
　　551 U.S. 193 (2007)........................................................................21

*S & S Machinery Co. v Masinexportimport,*
　　706 F.2d 411 (2d. Cir. 1983) .........................................................22

*Samantar v. Yousuf,*
　　560 U.S. 305 (2010).................................................................19, 20

*Stansell v. Fuerzas Armadas Revolucionarias de Colombia,*
　　771 F.3d 713 (11th Cir. 2014) ......................................................23

*The Schooner Exchange v. McFaddon,*
　　11 U.S. 116 (1812).........................................................................19

*Turkiye Halk Bankasi A.S. v. United States,*
　　598 U.S. 264 (2023) .................................................................19, 22

*Weininger v. Castro,*
　　462 F. Supp. 2d 457 (S.D.N.Y. 2006) ..........................................21

*Weinstein v. Islamic Republic of Iran,*
　　609 F.3d 43 (2d Cir. 2010) .......................................................21,22

*Zivotofsky v. Kerry,*
　　576 U.S. 1 (2015)...........................................................................17

**Statutes**

Foreign Sovereign Immunities Act,
    28 U.S.C. § 1330, 1602-11 .........................................................*passim*

Terrorism Risk Insurance Act of 2002,
    Pub. L. No. 107–297, 116 Stat. 2322......................................14, 21, 26

**Other Authorities**

*About Us: Departments*, DA AFGHANISTAN BANK ................................24

*Afghanistan: Economic Roots of the Humanitarian Crisis*, HUMAN
    RIGHTS WATCH (Mar. 1, 2022) ...................................................7, 8, 12

*Afghanistan: The Humanitarian Crisis and U.S. Response: Hearing
    Before the Subcomm. on Near East, South Asia, Central Asia, and
    Counterterrorism of the S. Comm. on Foreign Rels.*, 117th Cong.
    13 (2022) ........................................................................................11

*Afghanistan*, OCHA ..............................................................................9

*Afghanistan: Repression Worsens 2 Years into Taliban Rule*, HUM.
    RTS. WATCH (Aug. 10, 2023) ..........................................................11

*Afghanistan Refugee Crisis Explained,* USA for UNHCR, THE UN
    REFUGEE AGENCY (July 18, 2023), (July 18, 2023) ...........................6

*Afghanistan: WFP forced to cut food aid for 2 million more*, UNITED
    NATIONS (Sept. 5, 2023) ..................................................................11

*Amnesty International Report 2021/22: The state of the world's
    human rights*, AMNESTY INT'L (March 29, 2022)................................9

*Arbitrary and Illegal Detentions in Taliban-Ruled Afghanistan*,
    RAWADARI (Jan. 23, 2023) ................................................................7

Certain Iranian Assets (*Islamic Republic of Iran v. United States of
    America*), Verbatim Record (Oct. 8, 2018), Int'l Court of Justice,
    2018/28 ......................................................................................22, 23

Clayton Thomas, CONG. RSCH. SERV., R46955, TALIBAN GOV'T IN
    AFG.: BACKGROUND & ISSUES FOR CONGRESS (Nov. 2, 2021) ...........6

Clayton Thomas, CONG. RSCH. SERV., R46879, U.S. MILITARY WITHDRAWAL & TALIBAN TAKEOVER IN AFG.: FREQUENTLY ASKED QUESTIONS (Sept. 17, 2021).....................................................................6

Convention on Jurisdictional Immunities of States and their Property, *adopted* Dec. 2, 2004, G.A. Res. 59/38 .......................................18, 19

Exec. Order No. 14064, 87 Fed. Reg. 8391 (2022) ............................8, 26

Fereshta Abbasi, *Afghans Dying from Lack of Medicine*, HUM. RTS. WATCH (May 9, 2022) .....................................................................10

HAZEL FOX & PHILIPPA WEBB, *THE LAW OF STATE IMMUNITY* (Oxford University Press, 3d ed. 2015)....................................................18, 20

Hizbullah Khan, *The families losing their loved ones to hunger suicide in Afghanistan*, PROSPECT (March 9, 2023) ..........................11

H.R. Rep. No. 94-1487 (1976)....................................................................22

*Human Rights Situation in Afghanistan: Mid-year Report*, RAWADARI (Aug. 12, 2023) .........................................................................7

Lindsay Maizland, *The Taliban in Afghanistan,* COUNCIL ON FOREIGN RELATIONS (Jan. 19, 2023)....................................................................6

OFAC FAQs No. 9 ("What do you mean by 'blocking?'") .................26

Patricia Gossman, *Hard Choices in Afghanistan's Humanitarian Crisis,* HUM. RTS. WATCH (May 15, 2023) ........................................10

Press Release, *The Women's Forum on Afghanistan Deplores the Exclusion of Afghan Women from Key Talks on Afghanistan*, WOMEN'S FORUM ON AFGHANISTAN (Apr. 28, 2023) ........................12

R. JENNINGS & A. WATTS, OPPENHEIM'S INTERNATIONAL LAW, PEACE (9th ed., 1992)...........................................................................16

R. Bennett (Special Rapporteur on the Situation of Human Rights in Afghanistan), *Situation of human rights in Afghanistan*, U.N. Doc. A/HRC/52/84 (Feb. 9, 2023) ......................................................9, 11

*Repression, Regression & Reversal: One Year of Taliban Rule in Afghanistan*, RAWADARI (Dec. 10, 2022) ............................................................6

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES (1987).................................................................15, 16

*Second Statement of Interest of the United States, Rubin v. Islamic Republic of Iran*, No. 03-cv-9370 (N.D. Ill. Mar. 3, 2006)................................20

Situation in the Islamic Republic of Afghanistan, ICC-02/17, Order (Feb. 24, 2022)........................................................................................16

*Statement of the Women's Forum on Afghanistan*, Women's Forum on Afghanistan (Jan. 24, 2023) ................................................................7

Stefani Glinski, *'The Taliban know they need us': the Afghan hospitals run by women*, THE GUARDIAN (May 9, 2022) ...................................10

*Stopping State Failure in Afghanistan*, INT'L CRISIS GRP.: COMMENTARY (Jan. 27, 2022) ............................................................9

UN Secretary-General, *The situation and its implications for international peace and security*, U.N. Doc. A/77/772-S/2023/151 (Feb. 27, 2023).......................................................................................12

Yogita Limaye, Afghanistan: *'I drug my hungry children to help them sleep'*, BBC (Nov. 24, 2022) .........................................................11

ZAFIRIS TZANNATOS, UNDP, AFGHANISTAN SOCIO-ECONOMIC OUTLOOK 2021–2022: AVERTING A BASIC NEEDS CRISIS 2 (2021)......................8

# INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are Afghan and Afghan-American civil society and grassroots organizations undertaking human rights, legal, advocacy, and humanitarian efforts in and for Afghanistan and its people, including in response to the Taliban takeover of Afghanistan in August 2021 and while in exile. In a case that raises significant human rights, economic, geopolitical and jurisprudential matters, *Amici Curiae* bring a critical perspective otherwise not directly before the court: the interests of the Afghan people. *Amici Curiae*, and especially the Afghan civil society organizations, have committed many years to documenting abuses against and advancing the rights of Afghans – including women and girls, ethnic and religious minorities, human rights defenders, journalists and educators – before the United Nations, human rights treaty bodies, and before the Afghan government and judiciary, among other fora.

*Amici Curiae* have a direct and deep interest in the outcome of the turnover motions: to ensure that the remaining $3.5 billion of the Afghanistan's central bank, Da Afghanistan Bank ("DAB") assets currently held in the United States as sovereign funds are to be used for the people of Afghanistan to prevent further

---

[1]     No party or party's counsel authored this brief in whole or in part and no party or party's counsel made a monetary contribution intended to fund the preparation or submission of this brief. The *Owens* Plaintiffs-Appellants have consented to the filing of this brief.

deterioration of the economic, humanitarian, and human rights circumstances of Afghan civilians. Indeed, relieving the Taliban – a non-state entity – of their financial responsibility for their heinous crimes by punishing the sovereign Afghan people suffering under Taliban rule would produce a tragic injustice.

The **Transitional Justice Coordination Group** ("TJCG") is a coalition of 26 organizations and individuals active in the field of transitional justice inside and out of Afghanistan with focus on Afghanistan. The TJCG was formed in 2008 with the aim of strengthening advocacy and strategic coordination between organizations involved in transitional justice in Afghanistan. Since its inception, the group has been active and outspoken on transitional justice issues, and has dedicated itself to raising the voices of Afghanistan's victims of war and oppression, including assisting victim to participate in International Criminal Court's proceedings.

**Rawadari** is an Afghan human rights organization that aims to deepen and grow the human rights culture of Afghanistan, ultimately reducing the suffering of all Afghans, especially women and girls. Rawadari helps build an Afghan human rights movement, monitors human rights violations, and pursues justice and accountability for violations. Rawadari works with individuals and collectives inside and outside Afghanistan. For more information visit: https://rawadari.org/about/.

The **Women's Forum on Afghanistan** is an initiative created and led by Afghan women, with the support of global women leaders, to work for the well-being and human rights of the Afghan people. It advocates inclusive solutions to the social, economic, and political challenges the country is currently facing. The Women's Forum believes that women's rights in Afghanistan – access to education, employment, political participation, resources and freedom of movement – are critical to international peace and security in the country, the region, and the world.

**Global Advocates for Afghanistan** ("GAA") is an independent, Afghan-led movement which began as an emergency response to the deteriorating human rights and humanitarian crises unfolding in Afghanistan in the wake of the Taliban takeover in August 2021. GAA has led UN advocacy efforts and international and domestic campaigns in the U.S., Canada, and Europe, as well as worked with civil society groups to organize legal intake clinics in the U.S. for hundreds of recently arrived Afghan refugees.

**Project ANAR (Afghan Network for Advocacy and Resources)** is a national Afghan grassroots community immigration justice organization based primarily in San Francisco, California and in Virginia, that has coordinated urgent pro bono legal assistance efforts for Afghans. We offer services to community members seeking refuge and family reunification, and fighting deportation and detention. Project ANAR offers legal services, community outreach and education,

and advocacy related to immigrants' rights. Project ANAR is fiscally sponsored by Pangea Legal Services, a 501(c)(3) immigrant defense organization based in San Francisco, California. Project ANAR works in partnership with local Afghan community organizations and Afghan organizations across the country, and has offered direct legal services to more than 2,000 Afghans since August 2021. Project ANAR is founded and led by Afghan, Afghan American and other Asian American and Muslim women lawyers and organizers.

**Afghans For A Better Tomorrow** ("AFBT") is a grassroots, Afghan-led, advocacy and community organization whose mission aims to organize the Afghan-American community to bring about systemic change in the U.S. and beyond to ensure all Afghans have lives of safety, dignity, and freedom. AFBT provides critical aid and support to Afghans seeking asylum, builds capacity with Afghan-American youth and works to tell the stories of Afghan Americans to shift narratives..

The **Afghan-American Community Organization** ("AACO") is a 501(c)(3) nonprofit dedicated to advancing the Afghan-American community through education and outreach, and promoting civic and social engagement. Since 2015, AACO has brought the Afghan diaspora together to connect, uplift, and address the biggest issues facing the community through the largest annual conference for Afghan-Americans, the only scholarship program for Afghan-American students,

fundraising efforts for humanitarian causes in Afghanistan, and civic advocacy on behalf of the diaspora.

*Amici Curiae* urge this Court to affirm the District Court's ruling in which it declined to affirm its prior attachment order because the funds held in DAB are immune from attachment under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq*., § 1611, and ask the Court to preserve the Afghan Assets held in Afghanistan's Central Bank, Da Afghanistan Bank, for the Afghan people.

## INTRODUCTION AND SUMMARY OF ARGUMENT

This matter arises out of the 1998 bombing of U.S. embassies in Tanzania and Kenya, which killed over 200 people and injured thousands more, including loved ones of Plaintiffs-Appellants. *Amici Curiae* support Plaintiffs-Appellants' efforts to collect duly-authorized judgments against defendants, including the Taliban, whose crimes caused grievous suffering, but must oppose the method by which they seek to do so, namely by taking assets of Afghanistan's central bank, Da Afghanistan Bank ("DAB"), being held at the Federal Reserve Bank of New York ("FRBNY"), AA 458. The assets at issue are sovereign assets of the state of Afghanistan ("Afghan Assets"), and as such, are the assets of and for the Afghan people – not the Taliban. The Taliban bears responsibility for payment of any and all judgments against it; however, satisfaction of a judgment for its crimes should not – and cannot – come from the people of Afghanistan.

The Afghan Assets should be kept as sovereign reserves to *inter alia* maintain the value of the Afghan currency if not to directly support the population, and should not effectively be given to the Taliban, which is suppressing the rights of women and girls, human rights defenders, and ethnic and religious minorities, among others, and in doing so, exacerbating an already catastrophic humanitarian crisis. It would be profoundly unjust to transfer assets intended for the Afghan people to pay the Taliban's debts. Fundamental principles of foreign relations and separation-of-

powers make it clear that it is also unlawful: a court cannot authorize the seizure of sovereign assets of Afghanistan, which are protected by principles of foreign sovereign immunity under both international and U.S. statutory law. And contrary to Plaintiff-Appellants' arguments, the assets at issue *are* sovereign Afghan assets, and remain so regardless of the Taliban takeover and its effort to exert control over DAB as an entity. Any steps the United States has taken *for the benefit of the people of Afghanistan* to *protect* (not seize, take or use) these sovereign assets recognizes that these are the assets *of* DAB and the *property of Afghanistan*.

Accordingly, *Amici* submit that the relief Plaintiffs-Appellants are seeking is not only misdirected, but is wrong as a matter of law. As the District Court correctly determined in "conclud[ing] that the attachment order should not have been granted in the first instance" and thereby declining to confirm the seizure of DAB assets to satisfy any judgments against the Taliban, DAB is the central bank of Afghanistan, and as such, is immune from execution (AA 459, 462). It came to this conclusion in light of the fact that the Executive "reaffirmed DAB's status as a sovereign agency or instrumentality entitled to immunity notwithstanding a non-state terrorist entity's efforts to assert control over it" even after the Taliban takeover (AA 463), and then applied the law of foreign sovereign immunity codified in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.* (AA 463-64) to find that the

assets of DAB enjoy full immunity protections from adjudicative and enforcement jurisdiction.

It is for the Executive to recognize foreign sovereigns and their agencies and instrumentalities, and the owners of the foreign sovereign's central bank assets. The Biden administration did so. The Plaintiffs-Appellants are thus incorrect that the ownership of the DAB assets is a disputed issue. And they are likewise incorrect that the District Court erred when it undertook the judicial responsibility to apply these facts to the law (the FSIA); their real disagreement is with the result (immunity).

Further, as held in parallel proceedings as to 9/11 victims and other Joint-Creditors, the Taliban has not been recognized by the Executive (or any country in the world) as the government of Afghanistan, and the court is therefore prohibited under the U.S. Constitution from recognizing (implicitly or explicitly) that the Taliban is the legitimate government of Afghanistan, which is required for it to determine that DAB is an agency or instrumentality of the Taliban in order to turnover central bank assets to its creditors. *See In Re: Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570 (GBD) (SN), 2023 WL 2138691 (S.D.N.Y. Feb. 21, 2023), *appeal filed*, No. 23-258(L) (2d Cir. Mar. 1, 2023).

In asking this Court to reverse the District Court's decision, Plaintiffs-Appellants minimize or simply avoid these foundational facts and the well-

established legal principles in relation to state recognition, foreign sovereign immunity, and the status of and specific protections afforded to central banks. Without a basis for adjudicative jurisdiction over Afghanistan (including its central bank, DAB), Plaintiffs-Appellants cannot enforce any judgments against the sovereign state of Afghanistan's immunity-protected sovereign assets held in the central bank. Instead, Plaintiffs-Appellants focus their argument on the Taliban's alleged *control* over the extraordinary "property" at issue – Afghanistan's central bank, DAB, which under the FSIA *is* the foreign state, *see* 28 U.S.C. § 1603(a), and the property of a foreign central bank is immune from attachment. 28 U.S.C. § 1611(b)(1). The Plaintiffs-Appellants do not, and indeed cannot, establish the Taliban's *ownership* over DAB's sovereign assets.

The key question is who has title to the assets in the DAB account. As DAB has been for decades and continues to be an instrumentality of Afghanistan – a position affirmed by the Executive, which is empowered to make such determinations under the Constitution – that answer can only be Afghanistan, AA 450 (confirming DAB is an agency or instrumentality *of* Afghanistan, and thus not the Taliban); AA 462 (citing to U.S. Gov't Statement 21, *In Re: Terrorist Attacks on September 11, 2001*, No. 03 MDL 1570 (S.D.N.Y. Feb. 11, 2022), ECF No. 7661 ("U.S. SOI *Havlish*"). Consequently, Plaintiffs-Appellants, in seeking to collect

judgments against the Taliban, and not Afghanistan (which enjoys immunity from suit), have no title to execute their judgement against the Afghan Assets.

Attaching the Afghan Assets will not hold the Taliban accountable for the horrific acts of terror it imposed on Plaintiffs-Appellants and their loved ones; to the contrary, it would permit the Taliban to be relieved of a significant debt without bearing the punitive effects of payment of the judgments. Moreover, recognizing the Taliban as the owner of the sovereign assets of Afghanistan held in the state's central bank would necessarily – even if implicitly - grant the Taliban a level of sovereign recognition that not only contravenes U.S. foreign policy but also harms *Amici* and all Afghans who object to the Taliban's violent takeover of their country, including those on the ground who continue to challenge the Taliban's illegitimate and catastrophic rule despite the grave risk it poses to them of detention, disappearance or even death. It would also deprive the people of Afghanistan from funds they and their country need.

## BACKGROUND

### A. THE TALIBAN TAKEOVER, CONTINUED PERPETUATION OF THE HUMAN RIGHTS AND HUMANITARIAN CRISIS, AND IMPACT OF U.S. ACTIONS TOWARDS DAB ASSETS

The Taliban was formed in the early 1990s by Islamic guerilla fighters involved in resistance efforts against the Soviet Union's 1979-1989 occupation of

Afghanistan.[2]  In 1996, after Taliban forces seized Afghanistan's capital, Kabul, the extremist group ruled the country until the 2001 U.S.-led invasion following the September 11th attacks.[3] Despite losing power, the Taliban waged a two-decade insurgency in Afghanistan. As early as October 2018, up to 40% of Afghanistan was either under the Taliban's rule or disputed territory.[4]  By early August 2021, the Taliban had seized several border crossings and taken over half of Afghanistan's provincial capitals.  On August 15, 2021, the Taliban undertook its final effort to take over the country, seizing Kabul.

The effect of the Taliban takeover on the Afghan people was immediate. Over 1.6 million Afghans have fled the country in search of safety.[5]  Rights groups have documented grave human rights violations by the Taliban: in the first year of its rule, 1,174 people were killed,[6] and over 420 people including activists, journalists,

---

[2]    Lindsay Maizland, *The Taliban in Afghanistan,* COUNCIL ON FOREIGN RELS., (Jan. 19, 2023).

[3]    *Id.* The United States did not recognize the Taliban, maintaining that between 1996 and 2000, there was no functioning central government in Afghanistan. Clayton Thomas, CONG. RSCH. SERV., R46955, TALIBAN GOV'T IN AFGHANISTAN: BACKGROUND AND ISSUES FOR CONGRESS 28 (Nov. 2, 2021).

[4]    Clayton Thomas, CONG. RSCH. SERV., R46879, U.S. MILITARY WITHDRAWAL AND TALIBAN TAKEOVER IN AFGHANISTAN: FREQUENTLY ASKED QUESTIONS 9-10 (Sept. 17, 2021).

[5]    *Afghanistan Refugee Crisis Explained*, USA FOR UNHCR, THE UN REFUGEE AGENCY, (July 18, 2023).

[6]    *Repression, Regression & Reversal: One Year of Taliban Rule in Afghanistan*, RAWADARI 6 (Dec. 10, 2022), https://rawadari.org/wp-content/uploads/2022/12/One-Year-of-Taliban-Rule-in-Afghanistan.pdf.

professors and religious scholars were illegally detained in the fifteen months after the takeover.[7]  The violence has continued, with 516 individuals killed and injured in the first half of 2023, 342 of which were killed in targeted, mysterious, or extrajudicial killings.[8]  The Taliban is committing systemic human rights violations across Afghanistan, most notably in effort to erase women's rights and curtail the participation of women and girls in public life.  Every day, the Taliban is depriving women and girls "of their fundamental human rights and freedoms, including the right to education, the right to work and participate in public affairs, and the right to freedom of movement."[9]

Directly after the Taliban's violent takeover of Afghanistan, the U.S. effectively froze $7.1 billion of Afghan state reserves located at the FRBNY, asserting that it was an effort to prevent the Taliban from accessing funds that would otherwise contribute to the sovereign wealth of the country.[10]  DAB Central Bank was prevented from "accessing foreign currency reserves even as collateral to

---

[7]     *Arbitrary and Illegal Detentions in Taliban-Ruled Afghanistan*, RAWADARI 6 (Jan. 23, 2023), https://rawadari.org/230120231263.htm/.
[8]     *Human Rights Situation in Afghanistan: Mid-year Report*, RAWADARI 7, 10 (Aug. 12, 2023), https://rawadari.org/wp-content/uploads/2023/08/RW_AFGHumanRights2023_English.pdf.
[9]     *Id.* at 24*; see also Statement of the Women's Forum on Afghanistan*, WOMEN'S FORUM ON AFGHANISTAN (Jan. 24, 2023), https://www.womens-forum-afghanistan.org/wp-content/uploads/2023/01/January-23rd-statement.pdf.
[10]    *Afghanistan: Economic Roots of the Humanitarian Crisis*, HUM. RTS. WATCH (Mar. 1, 2022).

provide short-term liquidity to settle dollar transactions, make essential payments, purchase banknotes to hold auctions of dollars for private banks, or pay dues to the World Bank."[11]

Because of the central role played by DAB in the Afghan economy and the lives of Afghans, the U.S. government's decision to freeze the Afghan Assets has had serious and widespread effects, which the Taliban rule has only worsened, including shortages of currency in U.S. dollars and Afghan afghanis so that banks have been unable to lend money and citizens unable to withdraw their own funds.[12] Indeed, the entire Afghan population has been forced to bear the consequences of Taliban-specific sanctions and the cost of freezing Afghan assets. In recognition of *inter alia* the "significant humanitarian and economic concerns," the Executive made "certain property *of*" DAB available when it issued Executive Order 14064 by blocking DAB assets at the FRBNY, in recognition of the importance of the "preservation" of DAB's property to "addressing the welfare of the people of Afghanistan," and the OFAC license to enable $3.5 billion of the Afghan Assets to be used "for the benefit of the People of Afghanistan." Exec. Order No. 14064, 87 Fed. Reg. 8391-93 (2022), AA233; *see also* AA 451, note 2.

---

[11]   *Id.*
[12]   *Id.*; Zafiris Tzannatos, UNDP, AFGHANISTAN SOCIO-ECONOMIC OUTLOOK 2021–2022: AVERTING A BASIC NEEDS CRISIS 2 (2021).

8

Despite the continuing crisis, there is no indication that the Taliban views itself as concerned with the needs or respecting the interests of the people of Afghanistan, but rather, "ruling Afghanistan through fear and repressive policies aimed at suppressing communities, and women in particular."[13] It has restricted access to the courts, removed specialized courts for women, and ultimately eradicated a functioning legal system,[14] while engaging in the systematic persecution of religious and ethnic minorities and women and girls, and attacks on human rights defenders, journalists, and former government officials, among others.[15] Human rights defenders have been forced to change locations regularly due to fear and threats from the Taliban, including the raiding of civil society organizations' premises and demands for the "names and contact details of the staff and associated individuals, sometimes including family members."[16]

---

[13] R. Bennett (Special Rapporteur on Situation of Human Rights in Afghanistan), *Situation of human rights in Afghanistan*, ¶ 7, U.N. Doc. A/HRC/52/84 (Feb. 9, 2023) ("UN Special Rapporteur February 2023 Report").

[14] *Id.* at ¶¶ 50, 52-53, 55; *Stopping State Failure in Afghanistan*, INT'L CRISIS GRP.: COMMENTARY (Jan. 27, 2022).

[15] *Amnesty International Report 2021/22: The state of the world's human rights*, AMNESTY INT'L 66 (March 29, 2022) https://www.amnesty.org/en/documents/pol10/4870/2022/en/ (finding women lawyers and judges fired, forced into hiding and facing reprisals from men whom they had convicted for domestic and gender-based violence freed by the Taliban).

[16] UN Special Rapporteur February 2023 Report ¶ 64.

In the two years since the Taliban's takeover, Afghanistan continues to endure "one of the world's worst humanitarian disasters"[17] and unprecedented levels of "systemic collapse and human catastrophe."[18] The Taliban's crackdown on human rights undoubtedly exacerbates the humanitarian crisis, harming if not destroying many sectors of the country with little regard for providing for the basic needs of the people of Afghanistan: (1) the country's healthcare infrastructure is devastated, with shortages in essential medicine and medical equipment, doctors and healthcare workers are forced to forego pay, and Taliban authorities are carrying out targeted attacks on medical personnel by either banning female medical staff from medical practice or killing or detaining doctors or hospital officials;[19] (2) the economic and banking sector collapsed in functionality, with public confidence fractured; and (3) the education system – the largest employer in Afghanistan – can no longer provide

---

[17] Patricia Gossman, *Hard Choices in Afghanistan's Humanitarian Crisis,* HUM. RTS. WATCH (May 15, 2023), https://www.hrw.org/news/2023/05/15/hard-choices-afghanistans-humanitarian-crisis.

[18] *Afghanistan*, OCHA, https://www.unocha.org/afghanistan.

[19] Fereshta Abbasi, *Afghans Dying from Lack of Medicine*, HUM. RTS. WATCH (May 9, 2022), https://www.hrw.org/news/2022/05/09/afghans-dying-lack-medicine; Stefani Glinski, *'The Taliban know they need us': the Afghan hospitals run by women*, THE GUARDIAN (May 9, 2022), https://www.theguardian.com/global-development/2022/may/09/taliban-afghanistan-hospitals-run-by-women-doctors.

payments to educators and staff.[20] Approximately 700,000 are unemployed since the Taliban takeover – many of them women.[21]

Food insecurity is rampant, and with aid not arriving to meet the need, the United Nations World Food Program said it is forced to "choose between the hungry and the starving."[22] Families have resorted to "drugging hungry children to [make them] fall asleep."[23] Others have committed suicide.[24] "Over 1 million children under age 5 are suffering from prolonged acute malnutrition, with long-term consequences."[25]

Expert predictions that surfaced in 2021 of an unprecedented human rights and humanitarian catastrophe have regretfully proven to be true: in the lead-up to the two year anniversary of the Taliban takeover, the United Nations reported that

---

[20]   *Afghanistan: The Humanitarian Crisis and U.S. Response: Hearing Before the Subcomm. on Near East, South Asia, Central Asia, and Counterterrorism of the S. Comm. on Foreign Rel.*, 117th Cong. 13 (2022) (statement of Graeme Smith, Senior Consultant, Int'l Crisis Grp.).

[21]   UN Special Rapporteur February 2023 Report ¶ 28.

[22]   *Afghanistan: WFP forced to cut food aid for 2 million more*, UNITED NATIONS (Sept. 5, 2023), https://news.un.org/en/story/2023/09/1140372.

[23]   Yogita Limaye, *Afghanistan: 'I drug my hungry children to help them sleep'*, BBC (Nov. 24, 2022), https://www.bbc.com/news/world-asia-63733683. *See also* A/HRC/52/84 at ¶ 86.

[24]   Hizbullah Khan, *The families losing their loved ones to hunger suicide in Afghanistan*, PROSPECT (March 9, 2023) (reporting the statements of Samia, a 35-year-old widow, whose husband committed suicide: "My husband saw the cries of hungry children for months and tried several times to earn money and feed children, but failed and committed suicide as he lost hope.").

[25]   UN Special Rapporteur February 2023 Report ¶ 86.

the number needing such humanitarian assistance increased from 18.4 million to an estimated 28.3 million Afghans, or two-thirds of the country.[26]  The total is nearly 100% for households headed by women[27] – a profound example of how, especially in the case of women and girls, the human rights crisis in Afghanistan worsens the humanitarian catastrophe.[28]  One of the main causes of food insecurity is the Taliban's "harsh restrictions on women and girls' rights," leading to their dismissal from or loss of jobs, including due to the near-total ban on women working with local and international nongovernmental organizations and the United Nations.[29]

### B.  THE JUDGMENT DEBTOR.

There is no question that the State of Afghanistan is not and was never a party to these proceedings, which resulted in the judgment against the Taliban ("Taliban a/k/a Islamic Emirate of Afghanistan") (among other defendants) for which Plaintiffs-Appellants seek attachment, nor could it have been.  Sovereign immunity from jurisdiction only allows for very limited exceptions.  While the FSIA provides

---

[26]   UN Secretary-General, *The situation and its implications for international peace and security*, ¶ 55, U.N. Doc. A/77/772-S/2023/151 (Feb. 27, 2023).

[27]   *Afghanistan: Economic Roots of the Humanitarian Crisis*, *supra* note 11.

[28]   Press Release, *The Women's Forum on Afghanistan Deplores the Exclusion of Afghan Women from Key Talks on Afghanistan*, WOMEN'S FORUM ON AFGHANISTAN (Apr. 28, 2023), https://www.womens-forum-afghanistan.org/wp-content/uploads/2023/05/WFA-April-28-Press-Release.pdf.

[29]   *Afghanistan: Repression Worsens 2 Years into Taliban Rule*, HUM. RTS. WATCH (Aug. 10, 2023), https://www.hrw.org/news/2023/08/10/afghanistan-repression-worsens-2-years-taliban-rule.

such an exception for "state sponsors of terrorism," Afghanistan has never been designated as such.

Because the judgment was rendered against the Taliban, a non-state entity, none of the Plaintiffs-Appellants hold title to enforce their judgment against Afghanistan – or its assets.

### C. VIEWS OF THE UNITED STATES.

The United States has made evidently clear its position on the underlying factual questions in this matter and the legal principles relevant to the District Court's assessment of whether the FSIA would preclude confirmation of its attachment order: *first*, "the FSIA is explicit that 'the property in the United States of a foreign state shall be immune from attachment[,] arrest[,] and execution except as provided in [28 U.S.C. §§ 1610, 1611]; AA 450 (quoting 28 U.S.C. § 1609); *second*, the DAB, as Afghanistan's central bank, is to be treated as a "foreign state" under the FSIA because it is "an agency or instrumentality" of the State of Afghanistan, AA 451 (referring to *e.g.,* U.S. SOI *Havlish*, at 21); and *third*, DAB's property is immune from execution absent waiver of immunity, which has not happened here, or when an exemption to the FSIA applies (*e.g.*, commercial activities), which is not the case here.  AA451-52.

The United States also advised that, in addition to the immunities related to attachment, the FSIA provides foreign states and their agencies and instrumentalities

(including central banks) immunity from the jurisdiction of U.S courts, save with limited exceptions. AA450, n.1.[30]

## ARGUMENT

**I. UNDER FUNDAMENTAL PRINCIPLES OF U.S. FOREIGN RELATIONS AND INTERNATIONAL LAW, ASSETS OF THE DAB, AS AN AGENCY OF AFGHANISTAN, ARE PROTECTED SOVEREIGN ASSETS FOR THE STATE AND ITS PEOPLE, NOT THE TALIBAN.**

Contrary to Plaintiffs-Appellants' argument that the FSIA is irrelevant, consideration of their appeal must begin with this statute, which governs the immunities afforded to foreign states in U.S. courts and the comity and foreign relations principles undergirding it. The FSIA and other statutes related to jurisdiction over foreign sovereigns (and their agencies or instrumentalities) are informed by fundamental principles of public international law, as incorporated into U.S. law, and U.S. foreign relations law governing recognition of sovereigns (and governments), ownership of sovereign assets, and immunities that apply to sovereign assets. *See The Paquete Habana,* 175 U.S. 677, 700 (1900) (finding "[i]nternational law is part of our law and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it

---

[30]     The United States also observed that the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107–297, 116 Stat. 2322, was inapplicable as it provides no basis for prejudgment attachment. AA451-52, n.4.

are duly presented for their determination"). As such, the following international law principles apply in this case.

### A. THE STATE OF AFGHANISTAN, AND ITS AGENCY DAB, NOT THE TALIBAN, IS THE SOVEREIGN ENTITY OF AFGHANISTAN.

Granting Plaintiffs-Appellants' appeal would implicitly credit a flawed premise that the current *de facto* rulers of Afghanistan, the Taliban, who assumed the levers of governmental power through a sustained campaign of violence and terror against Afghan citizens, represents the sovereign state of Afghanistan. Elementary principles of constitutionalism and popular sovereignty recognizes that sovereignty inheres in the people – not in governments and certainly not in *de facto* authorities that seize power through violence.

Specifically, under international law, a sovereign state is "an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 201. Afghanistan, as a sovereign state, has been a member state of the United Nations since 1946. A foreign state is distinct from a foreign government. *Id.* at §203 cmt. a ("A state can . . . recognize or treat an entity as a state while denying

15

that a particular regime is its government").[31]

Changes of government – even in the context of hostile takeovers or *coup d'états* – have no effect on the legal personality and the continuity of states *qua* states. *See* Situation in the Islamic Republic of Afghanistan, ICC-02/17, Order, ¶ 15 (Feb. 24, 2022); Restatement (Third) of Foreign Relations Law § 208 cmt. a ("*Succession of states and governments distinguished*: Under international law, the capacities, rights, and duties . . . appertain to the state, not to the government which represents it. . . . They are not affected by a mere change in the regime or in the form of government or its ideology").

It is a truism that while governments come and go, the State's legal personality remains:

> the effect of a revolution resulting in a government which for a time fails to secure any recognition from foreign states, does not destroy the international personality of the state or free it, permanently at any rate, from existing treaty obligations; though it involves an interruption in that state's ability to exercise its legal capacity for international purposes.

1. R. JENNINGS & A. WATTS, OPPENHEIM'S INTERNATIONAL LAW: PEACE § I 149-50, ¶ 44 (9th ed., 1992).

---

[31] This section (Part II: Persons in International Law) of the Third Restatement has not been altered or amended by, or covered in, ALI's RESTATEMENT (FOURTH) OF FOREIGN RELATIONS LAW.

U.S. courts have upheld the distinction between State and government. For example, in a case involving the consequences of the nonrecognition of the Soviet Government by the United States, the Supreme Court distinguished between the rights of the State and the government. *See Guar. Tr. Co. v. United States*, 304 U.S. 126, 137 (1938) ("the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it").

Under the U.S. Constitution, the President has the power to recognize (or not recognize) foreign nations and governments – "an act with immediate and powerful significance for international relations." *Zivotofsky v. Kerry*, 576 U.S 1, 21 (2015). *See* S.A. 26-27. Accordingly, it has long been recognized that such a power is "outside the competence" of courts. *Nat'l City Bank v. Republic of China*, 348 U.S. 356, 358 (1955); *see also Baker v. Carr*, 369 U.S. 186, 212 (1962) ("recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing,'" and therefore "the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory"). President Biden has not recognized the Taliban – a *de facto* authority, at best – as the government of Afghanistan – a position shared by every country in the world. The Taliban's takeover does nothing to change the sovereign status of Afghanistan and the constituent people of Afghanistan. Likewise, the Executive has not "disputed" that the DAB assets are

sovereign assets, as Plaintiffs-Appellants assert; on the contrary, every action it has taken since the Taliban takeover has affirmed – and made "readily apparent" that they are. *See* Pl-App. Br. at 35-41.

## B. PRINCIPLES OF FOREIGN SOVEREIGN IMMUNITY PROTECT THE SOVEREIGN PROPERTY OF AFGHANISTAN, INCLUDING DAB, FROM ATTACHMENT AND TURNOVER IN U.S. COURTS.

Plaintiffs-Appellants give short shrift to longstanding common law principles recognizing foreign sovereign immunity, and in so doing, urge this Court to go down a path that would not only contravene the FSIA's black-letter law but would place the United States in contravention of international norms, practices and obligations. This Court should decline to do so. Under both customary international law and treaty law, foreign sovereigns enjoy immunity, in respect to the state itself and its property, for public acts in the national courts of other countries with limited exceptions and as specifically waived. *See* Hazel Fox & Philippa Webb, THE LAW OF STATE IMMUNITY, (Oxford University Press, 3d ed. 2015); Convention on Jurisdictional Immunities of States and their Property, *adopted* Dec. 2, 2004, G.A. Res. 59/38 ("U.N. State Immunities Convention") *Preamble* (recognizing that "jurisdictional immunities of States and their property are generally accepted as part

of customary international law");[32] *Samantar v. Yousuf*, 560 U.S. 305, 311 (2010) (finding that the doctrine of foreign sovereign immunity was developed as a matter of "grace and comity" under common law); *Turkiye Halk Bankasi A.S. v. United States*, 598 U.S. 264, 271 (2023) ("*Halkbank*") ("the doctrine of sovereign immunity developed in U.S. courts 'as a matter of common law' rather than by statute") (citations omitted).

The notion that a foreign state enjoys immunity derives from principles of independence, equality, and dignity of States. *See The Schooner Exchange v. McFaddon*, 11 U.S. 116, 123 (1812). Foreign sovereign immunity applies with regards to immunity from jurisdiction *and* immunity from enforcement. *See, e.g.,* U.N. State Immunities Convention, art. 5 (adjudication) and art. 19 (enforcement). Notably, because "[e]nforcement against State property constitutes a greater interference with a State's freedom to manage its own affairs and to pursue its public purposes, immunity from enforcement has been called "the last fortress, the last bastion of State immunity" as it continues to provide immunity protections over state property even when exceptions allowed a state to be sued in another nation's court.

_____

[32]    Although the U.N. State Immunities Convention has not yet entered into force, provisions codifying sovereign immunity from jurisdiction and attachment have been found to reflect customary international law. *See,* U.N. Introductory Note on U.N. State Immunities Convention (Oct. 2017), https://legal.un.org/avl/ha/cjistp/cjistp.html.

*See* Fox & Webb, THE LAW OF STATE IMMUNITY 486, 484. *See id.* at 519 (national courts recognize state ownership of assets, as well as the public use and purpose, as the basis for immunity from enforcement for categories of state property, including central banks). Notably, the United States has expressed this same position. *See* Second Statement of Interest of the United States 6-7, *Rubin v. Islamic Republic of Iran*, No. 03-cv-9370 (N.D. Ill. Mar. 3, 2006), ECF No. 145 (observing that lifting immunity from enforcement was "more difficult" than lifting immunity from jurisdiction because "*judicial* incursion on a foreign sovereign's property is often likely to be far more problematic from a foreign relations point of view than simply requiring the sovereign to appear to defend a lawsuit on the merits").

It should be noted that blocking the assets of a foreign state is fundamentally different in nature than enforcement actions, and falls outside the protections of foreign sovereign immunity. For this reason (among others), that the United States has *blocked* the DAB assets has no bearing on immunities in enforcement actions, which involve taking property and changing ownership rights.

The United States codified the law of foreign sovereign immunity in the FSIA, which allows for certain exceptions arising out of commercial activities – the "restrictive immunity doctrine" – and later, designations as a state sponsor of terrorism, and courts regularly look to international law and practice to decide immunity questions arising from its application. *See Samantar*, 560 U.S. at 319-320

(Congress "recognized [the FSIA] was consistent with extant international law");
*Permanent Mission of India to United Nations v. City of New York*, 561 U.S. 193, 199 (2007) (same). Accordingly, U.S. statutes – including the FSIA or, when invoked or at issue, the TRIA – must be interpreted to accord with international law wherever possible and should be applied so as to conform with the United States' international obligations. *Murray v. The Schooner Charming Betsy*, 2 Cranch 64, 118 (1804) ("an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains").

Afghanistan, as a state that has never been designated a state-sponsor of terrorism, enjoys both jurisdictional immunity (save for commercial activities exceptions set forth in the FSIA) and immunity of attachment or execution of its sovereign property. *See Weininger v. Castro,* 462 F. Supp. 2d 457, 481 (S.D.N.Y. 2006); *see also* 28 U.S.C. §§ 1604, 1609, 1611. Immunity from attachment has been abrogated with regards to sovereign assets held in central banks under TRIA (which is not asserted as a basis for attachment – or jurisdiction – here) *only* in cases involving states that have been designated as state-sponsors of terrorism, in accord with the political branches' determination that such odious conduct warrants the limitation or revocation of foreign sovereign immunity so that judgment against terrorist states are enforced. *See, e.g, Weininger* (Cuba)*; Gates v. Syrian Arab Republic,* 2013 WL 1337223 at *5-7 (Mar. 29, 2013) (Syria); *Weinstein v. Islamic*

*Republic of Iran*, 609 F.3d 43 (2d Cir. 2010) (Iran). Afghanistan has done no such offense to merit any such reduction in its statutory or customary international law immunities.

### C. DAB IS AN AGENCY/INSTRUMENTALITY OF THE SOVEREIGN STATE AND IMMUNE FROM JUDICIAL PROCESS IN U.S. COURTS.

Plaintiffs-Appellants seek to attach assets held by Afghanistan's central bank, the DAB. It is well-established that a foreign state's central bank constitutes an "agency or instrumentality" of that foreign state. *See, e.g., S & S Machinery Co. v Masinexportimport,* 706 F.2d 411, 414 (2d. Cir. 1983) (describing a sovereign's central bank as the "paradigm of a state agency or instrumentality"); H.R. Rep. 94-1487 (1976) at 15-16 (identifying a central bank as an entity that constitutes an 'agency or instrumentality of a foreign state' for purposes of Section 1603 of the FSIA). Moreover, the FSIA makes clear that agencies and instrumentalities of a foreign state *are* "a foreign state." *See* 28 U.S.C. § 1603(a) ("A "foreign state" […] includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state […]"); *see also Halkbank*, 598 U.S. at 272 ("The FSIA defines a "foreign state" to encompass instrumentalities of a foreign state").[33] This Court

---

[33] As counsel for the United States explained regarding the role and status of central banks in its submission before the International Court of Justice in *Certain Iranian Assets*:

decision in *NML Capital, Ltd. v. Banco Central de la República Argentina,* in which it held that the "funds of foreign central banks" are, in fact, the "reserves of the foreign states' themselves," follows from this conclusion. 652 F.3d 172, 189 (2d Cir. 2011); *see also* U.S. SOI *Havlish*, at 25-26 (affirming assets of a foreign central bank belong "to the foreign state and thus would not be the assets of a private party."). As this is a matter of black-letter law under the FSIA, Plaintiffs-Appellants cannot rebut this fact or challenge the District Court's (correct) finding of such status (despite trying, Pl. App. Br. 47-50), which would be required to make a finding that these same assets can be deemed an agency or instrumentality of a non-state entity. *See Caballero v. FARC*, 945 F.3d 1270, 1276 (10th Cir. 2019) (quoting to *Stansell v. FARC*, 771 F.3d 713, 723 (11th Cir. 2014) (holding that "[i]f the party wishes to execute against the assets of a terrorist party's agency or instrumentality, the party must further establish that the purported agency or instrumentality is *actually* an

---

**When a State entity like a traditional central bank is entrusted with sovereign functions** like supervising and regulating the country's banking system, issuing currency, and holding and investing the State's foreign reserves, it is presumed to be acting on behalf of the State, not as a "company" with private comparators . . . such an entity acts not as a "creation of the State" that is, a company that is simply constituted in accordance with the State's laws but acts as **"the State as such."**

Excerpts from hearing held on October 8, 2018 in case concerning Certain Iranian Assets (*Islamic Republic of Iran v. United States of America*), Verbatim Record (Oct. 8, 2018), Int'l Court of Justice, 2018/28 (emphasis added).

agency or instrumentality") (emphasis added).

Accordingly, central banks readily come within the statutory definition of a "foreign State," with the assets therein qualifying as sovereign property entitled to protection from attachment. 28 U.S.C. § 1609; *see S & S Machinery Co.,* 706 F.2d at 416. Indeed, central banks often enjoy greater protections from enforcement under international law than other agencies or instrumentalities. *See* Fox & Webb, THE LAW OF STATE IMMUNITY 255, 528. Central bank assets are crucial for the State to exercise sovereign activities such as currency stabilization, printing currency, holding currency auctions and more generally regulating and supporting the banking sector. These are the very functions normally carried out by the DAB: "As Central Bank of Afghanistan, Da Afghanistan Bank operates to stabilize price levels, strengthen the financial sector, ensure the safety of payment system, manage currency reserves effectively, print Afghani banknotes and act as state banker." DAB, About Us: https://dab.gov.af/index.php/departments.

In accord with international law, and in light of their specific functions, the FSIA "shields from execution property 'of a foreign central bank or monetary authority for its own account.'" *Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016) (quoting 28 U.S.C. §1611(b)(1)). Notably, this Court has opined that foreign central banks enjoy heightened immunities from enforcement "to provide an incentive for foreign central banks to maintain their reserves in the United

States." *EM Ltd. v. Repub. of Arg.*, 473 F.3d 463, 473 (2d Cir. 2007). In seeking

Afghanistan's assets held in its central bank, the Plaintiffs-Appellants are, in fact,

declaring the foreign state *itself* as the target of this action. As such, the action is

barred by the immunities Afghanistan (and its agencies and instrumentalities) enjoy

under the FSIA, as the District Court correctly held. It is wrong for the Plaintiffs-

Appellants to claim that the "the blocked [DAB] Funds are not the property of a

sovereign state," when it is the coffers of the state of Afghanistan which would be

emptied if attachment and subsequently turnover permitted. Pl. App. Br. 72.

### D. TITLE OVER DAB'S ASSETS WAS UNAFFECTED BY THE TALIBAN TAKEOVER AND THEY REMAIN ASSETS OF THE SOVEREIGN – NOT THE TALIBAN.

In an effort to seize foreign state assets that are otherwise immune from

attachment or execution, Plaintiffs-Appellants argue that the central bank assets

actually went from being sovereign funds to being private funds when the Taliban

overtook the previous regime. The alleged *control* that Plaintiffs-Appellants claim

the Taliban have of *DAB*, *see* Pl. App. Br. 23, as an entity (*if* established) does *not*

translate to *ownership* over *DAB funds,* including the Afghan Assets. The Afghan

Assets *cannot* simultaneously be the property "of" *both* the sovereign state of

Afghanistan *and* a non-state entity, the Taliban – even if the latter may be operating

as the *de facto* authority, but universally unrecognized, government.

Furthermore, blocking property does not change title; it only limits the powers

and privileges associated with ownership. As the United States explained in relation to the blocking of the very DAB assets at issue, "[w]hen property is blocked, "[t]itle . . . remains with the target, but the exercise of powers and privileges normally associated with ownership is prohibited without authorization from OFAC."" U.S. SOI *Havlish,* 7 (quoting OFAC FAQs No. 9 ("What do you mean by 'blocking?'"), available at https://home.treasury.gov/policy-issues/financial-sanctions/faqs/9). Furthermore, in the case of DAB assets, they were blocked in recognition of the importance of the "preservation" of DAB's property to "address[] the welfare of the people of Afghanistan," and the OFAC license issued to enable $3.5 billion of the Afghan Assets to be used "for the benefit of the People of Afghanistan." Exec. Order No. 14064, 87 Fed. Reg. 8391-93 (2022).

Here, the Afghan Assets, as assets in Afghanistan's central bank belong to the state and *only the state.* A relationship between the Taliban (even as a *de facto* government) and the contested assets or an interest in the assets is not enough; legal title is required. *See, e.g., Heiser v. Islamic Republic of Iran,* 735 F.3d 934, 941 (D.C. Cir. 2013) (finding in context of TRIA, that a relationship between an entity and the contested assets is insufficient; legal title is required). Like in *Hausler v. JP Morgan Chase Bank, N.A.,* 770 F3d 207, 212 (2d. Cir. 2014), because the Taliban "does not have any property interest" in the Afghan Assets, they are not the blocked assets "of" the Taliban. *See also Bank of N.Y. v. Nickel*, 789 N.Y.S. 2d 95, 99 (N.Y. App.

Div. 2004) ("It is beyond cavil that attachment will only lie against the property of the debtor, and that the right to attach the property "is only the same as the defendant's own interest in it.") (citations omitted). To allow property that does not belong to the Taliban to be used to satisfy judgments against it "punish[es] innocent third parties" – the people of Afghanistan – not the Taliban. *See Heiser,* 735 F.3d at 939, 940.

For those foreign states that, like Afghanistan, are *not* designated as a state sponsor of terrorism, the FSIA provides the exclusive basis to bring suit against the state or its agencies or instrumentalities. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989). Plaintiffs-Appellants seek to make an end-run around the FSIA and lay claim to sovereign assets through an attachment proceeding by enforcing a judgment against a non-sovereign terrorist party, the Taliban, with funds in which the Taliban have no ownership interest.

As the property at issue belongs to the central bank of a foreign state, it enjoys the full protections of the FSIA, and specifically 28 U.S.C. §1611(b)(1), which states in clear and unambiguous terms that "the property of a foreign state *shall* be immune from attachment and execution if the property is that of a foreign central bank […] held for its own account" unless immunity has been explicitly waiver by the "parent foreign government." (emphasis added). Enforcement requires the judicial authority to ensure that the title (here, the judgment) matches the entity it is enforced against.

That is clearly not the case here, as Plaintiffs-Appellants are seeking to attach assets whose ownership does not rest with the Taliban. The Taliban themselves have no title over the Central Bank's assets; such title rests with the State. And its assets are immune from attachment. The District Court was therefore correct in denying attachment.

## CONCLUSION

For the foregoing reasons, Plaintiffs-Appellants' appeal should be dismissed.

Dated: October 6, 2023                    Respectfully submitted,

                                          */s/Katherine Gallagher*
                                          _____
                                          Katherine Gallagher
                                          Sadaf Doost
                                          CENTER FOR CONSTITUTIONAL
                                          RIGHTS
                                          666 BROADWAY, 7TH FL.
                                          NEW YORK, NY 10012
                                          Phone: (212) 614-6464

                                          *Counsel for* Amicus Curiae

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and Local Civil Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,437 words.

2.     This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: October 6, 2023               By:     /s/ *Katherine Gallagher*
                                              Katherine Gallagher

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 6, 2023, I electronically filed the foregoing Brief of *Amici Curiae* Afghan and Afghan-American Civil Society Organizations: Transitional Justice Coordination Group, Rawadari, Women's Forum on Afghanistan, et al. Supporting Affirmance with the Clerk of the Court of the United States Court of Appeals for the Second Circuit using the Court's CM/ECF system and served on all counsel of record via CM/ECF. Pursuant to Local Rule 31.1, six paper copies are also delivered to the Court.

Dated: October 6, 2023                    By:    */s/ Katherine Gallagher*
                                                 Katherine Gallagher