# 23-354 (L), 23-797(C)

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

ESTATE OF JESSE NATHANAEL ALIGANGA, et al.,
RIZWAN KHALIQ, et al., JAMES OWENS, et al.,

*Plaintiffs-Appellants,*

v.

TALIBAN, AKA THE ISLAMIC EMIRATE OF AFGHANISTAN,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the Southern District of New York
Hon. Valerie E. Caproni
Case No. 1:22-cv-01949 (VEC)

---

**Reply Brief of Plaintiffs-Appellants**

---

*(Counsel for Plaintiffs-Appellants Listed on Inside Cover)*

Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-5236
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

Clifton S. Elgarten
Emily M. Alban
CROWELL & MORING LLP
1001 Pennsylvania Avenue N.W.
Washington, D.C. 20004
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
celgarten@crowell.com
ealban@crowell.com

Matthew D. McGill
  *Counsel of Record*
Jessica L. Wagner
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com
jwagner@gibsondunn.com

Jane Carol Norman
BOND & NORMAN LAW, PC
6205 Executive Blvd.
Rockville, MD 20852
Telephone: (202) 682-4100
Facsimile: (202) 207-1041
jnorman425@icloud.com

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................. 1

ARGUMENT ...................................................................... 4

I.   The District Court Erred In Holding That The Funds Are
     Protected By Sovereign Immunity ................................... 4

     A.   The Funds Lack Immunity Under Section 1611 .................. 4

          1.   DAB Is Not An "Agency Or Instrumentality" Of
               Afghanistan, So Property Held In Its Name Is Not
               "Property Of A Foreign State" ......................... 5

          2.   Under *NML Capital*'s Governing Test, The Funds
               Were Not Held For DAB's Own Account At the Time
               of Attachment ......................................... 8

     B.   Section 1609 Confers No Immunity On the Funds .............. 12

          1.   DAB Is Not An "Agency Or Instrumentality" Of
               Afghanistan ........................................... 13

          2.   The Funds Are Not Property Of The Notional "State
               of Afghanistan" ....................................... 14

     D.   Amici Do Not Seriously Contest That Attachment Was
          Otherwise Proper Under New York Law ....................... 21

II.  The District Court Erred In Enforcing Attachment Immunity
     *Sua Sponte* ..................................................... 24

     A.   *Verlinden* And *Walters* Do Not Authorize *Sua Sponte*
          Enforcement of Attachment Immunity ........................ 24

     B.   The Sovereign Status Of The Funds Is Unclear .............. 26

     C.   Jurisdictional Immunity Is Not At Issue ................... 27

     D.   *Pimentel* Is Inapposite And Does Not Require Joinder ..... 29

CONCLUSION ..................................................................... 36

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Bank of China v. Wells Fargo Bank & Union Tr. Co.*,
  209 F.2d 467 (9th Cir. 1953) ....................................................9

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003)...........................................................6, 15

*EM Ltd. v. Banco Central de la República Argentina*,
  800 F.3d 78 (2d Cir. 2015)................................................15, 23

*Exp.-Imp. Bank of the Republic of China v. Grenada*,
  768 F.3d 75 (2d Cir. 2014)...........................................5, 6, 15

*Filler v. Hanvit Bank*,
  378 F.3d 213 (2d Cir. 2004) ....................................................6

*Hotel 71 Mezz Lender LLC v. Falor*,
  926 N.E.2d 1202 (N.Y. 2010)................................................22

*Kirschenbaum v. 650 Fifth Ave. & Related Props.*,
  830 F.3d 107 (2d Cir. 2016).....................................................7

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille
  Lauro in Amministrazione Straordinaria*,
  937 F.2d 44 (2d Cir. 1991)...............................17, 18, 19, 33

*Laco X-Ray Sys., Inc. v. Fingerhut*,
  88 A.D.2d 425 (N.Y. App. Div. 1982) ..................................23

*Metro. Diagnostic Imaging Grp., LLC v. U.S. Heartcare Mgmt., Inc.*,
  2010 WL 3073727 (N.Y. Sup. Ct. July 26, 2010)................22

*NML Capital, Ltd. v. Banco Central de la República Argentina*,
  652 F.3d 172 (2d Cir. 2011)...............................2, 8, 9, 14

*Palestine Monetary Auth. v. Strachman*,
  62 A.D.3d 213 (N.Y. App. Div. 2009) ..................................23

ii

*Peregrine Myanmar Ltd. v. Segal*,
  89 F.3d 41 (2d Cir. 1996)................................................................32, 33

*Peterson v. Islamic Republic of Iran*,
  627 F.3d 1117 (9th Cir. 2010) ..............................................................26

*Provident Tradesmens Bank & Tr. Co. v. Patterson*,
  390 U.S. 102 (1968).................................................................................30

*Pulvers v. First UNUM Life Ins. Co.*,
  210 F.3d 89 (2d Cir. 2000)...............................................................2, 13

*In re Quigley Co.*,
  676 F.3d 45 (2d Cir. 2012).................................................................2, 13

*Republic of Philippines v. Pimentel*,
  553 U.S. 851 (2008)......................................................29, 30, 31, 32

*Rubin v. Islamic Republic of Iran*,
  830 F.3d 470 (7th Cir. 2016) ................................................................35

*United States v. Assa Co.*,
  934 F.3d 185 (2d Cir. 2019)..........................................................28, 29

*United States v. Huckabee*,
  83 U.S. (16 Wall.) 414 (1872) ..............................................................19

*Vera v. Republic of Cuba*,
  651 F. App'x 22 (2d Cir. 2016)......................................................27, 28

*Verlinden B.V. v. Cent. Bank of Nigeria*,
  461 U.S. 480 (1983).........................................................................24, 25

*Walters v. Indus. & Com. Bank of China, Ltd.*,
  651 F.3d 280 (2d Cir. 2011).............................................12, 24, 25, 27

**Statutes**

28 U.S.C. § 1330 ...............................................................................28

28 U.S.C. § 1331 ...............................................................................28

iii

28 U.S.C. § 1350 ....................................................................28

28 U.S.C. § 1367 ....................................................................28

28 U.S.C. § 1603 ..............................................................5, 6, 7, 13, 14

28 U.S.C. § 1603(b)(2)........................................................5, 6, 16

28 U.S.C. § 1604 ....................................................................28

28 U.S.C. § 1609 ....................................................2, 4, 12, 13, 14, 15

28 U.S.C. § 1610 ......................................................................8

28 U.S.C. § 1611 ....................................1, 4, 5, 8, 9, 10, 12, 14, 21

N.Y. C.P.L.R. § 5201...............................................................22

N.Y. C.P.L.R. § 6202...............................................................22

**Rules**

Fed. R. Civ. P. 19.....................................3, 29, 30, 31, 32, 33, 34

Fed. R. Civ. P. 64....................................................................22

**Other Authorities**

Arthur Berriedale Keith, *The Theory of State Succession* (1907)...........20

Ashok Sharma, *Afghan Embassy Says It Is Stopping Operations in Indian Capital*, AP News (Sept. 29, 2023), https://tinyurl.com/2m5myjek ...........................................18

D.P. O'Connell, *The Law of State Succession* (1956)...............................19

Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265 (1982) ........9

Lara Jakes, *Afghan Embassy, Now Out of Money, Will Shut Down, U.S. Says*, N.Y. Times (Mar. 11, 2022), https://tinyurl.com/3kjenadc .......18

Oscar Svarlien, *An Introduction to the Law of Nations* (1955)...............20

U.S. Embassy in Afghanistan, *Joint State-Treasury Statement: The Afghan Fund* (Sept. 13, 2022), https://af.usembassy.gov/joint-state-treasury-statement-the-afghan-fund....................................................11

Wright & Miller, Fed. Prac. & Proc. Civ. (3d ed.)....................................34

# INTRODUCTION

The district court vacated Plaintiffs-Appellants' ("Victims") attachment of assets ("Funds") held in the name of Da Afghanistan Bank ("DAB") at the Federal Reserve Bank of New York on the basis of supposed central-bank immunity under 28 U.S.C. § 1611.  As Victims have demonstrated, the district court's decision rested on multiple legal errors that compel reversal:  The district court erred in enforcing attachment immunity *sua sponte*; it erred in deferring to the Executive Branch's assertion that the FSIA provides attachment immunity for the Funds; and it erred by failing to give any legal significance to the undisputed fact that DAB is now controlled by the Taliban, a non-state actor.

The briefs of amici Naseer A. Faiq ("Mr. Faiq") and the Afghan and Afghan-American Civil Society Organizations ("Organizations") barely address—let alone defend—the district court's analysis under Section 1611.  Like the district court, they do not grapple with Victims' undisputed evidence demonstrating that DAB has become the alter ego of the Taliban.  Amici do not dispute that DAB today performs no central-banking functions, or that the Funds have not been used for central-

1

banking functions since the Taliban took over. Instead, amici suggest that whether the Funds are "being used for central banking functions" is not actually the relevant inquiry, despite this Court's thoroughly reasoned decision in *NML Capital, Ltd. v. Banco Central de la República Argentina*, 652 F.3d 172, 194 (2d Cir. 2011).

Unable to rehabilitate the district court's reasoning, amici pivot to new arguments. The Court need not consider those arguments. *See In re Quigley Co.*, 676 F.3d 45, 53 n.5 (2d Cir. 2012) ("an issue raised only by an *amicus curiae* is normally not considered on appeal" (citation omitted)); *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 96 (2d Cir. 2000) (upholding "rule that we ordinarily will not consider arguments raised for the first time on appeal"). But each of amici's new arguments fails in any event.

Amici contend that the Funds are immune under 28 U.S.C. § 1609, which sets forth the immunity generally applicable to foreign states. But as Victims demonstrated, and as amici fail to rebut, DAB is no longer the "agency or instrumentality" of any foreign state—it is an alter ego of the Taliban. Indeed, because it currently has no functional government, not

even Afghanistan itself qualifies as a "foreign state" under the FSIA and this Court's precedent.

Amici's alternative suggestion that the Court dismiss this case *sua sponte* because Afghanistan is a required party that cannot be joined under Federal Rule of Civil Procedure 19 similarly fails. Amici badly distort the precedent on which they rely, and in no event does Rule 19 compel dismissal.

Ultimately, amici rest on misguided policy arguments that the Funds—which were previously central bank reserves, not individual savings accounts—belong to the people of Afghanistan writ large. But amici's claim to the Funds comes only from President Biden's decision to seize them and divert half for humanitarian relief in Afghanistan. Amici's attempt to reverse President Biden's decision to leave the other half available for victims of terrorism—and to obtain all the Funds for themselves—ignores the horrific suffering Victims have faced. It is properly addressed to the political branches, not this Court.

The district court's order vacating Victims' writ of attachment should be reversed.

## ARGUMENT

**I. The District Court Erred In Holding That The Funds Are Protected By Sovereign Immunity**

Amici fail to establish any statutory basis for immunizing the Funds from attachment. Neither central-bank immunity under Section 1611 nor foreign-state immunity under Section 1609 applies. DAB is now an alter ego of the Taliban, which is not a foreign state to which the FSIA accords any form of immunity.

### A. The Funds Lack Immunity Under Section 1611

Amici barely respond to Victims' contention that the Funds are not protected by the central-bank immunity set forth in Section 1611 of the FSIA. That provision accords immunity to certain "property of a foreign state" that is "property … of a foreign central bank … held for its own account." 28 U.S.C. § 1611(b)(1). In their opening brief, Victims demonstrated that the Funds neither qualify as the "property of a foreign state" nor were "held for [DAB's] own account" at the time of attachment. Amici have little to say on either point.

4

### 1. DAB Is Not An "Agency Or Instrumentality" Of Afghanistan, So Property Held In Its Name Is Not "Property Of A Foreign State"

Victims set forth detailed arguments and evidence demonstrating that DAB's Funds are not the "property of a foreign state" for purposes of Section 1611 because DAB was not an "agency or instrumentality" of Afghanistan under Section 1603 at the time of attachment. *See* AOB 53-66. Amici do not even attempt to engage with that analysis. The Organizations simply assert that DAB is a central bank and thus qualifies as an "agency or instrumentality" of Afghanistan under Section 1603, Org. Br. 22-23, while Mr. Faiq, for his part, argues that the Section 1603 inquiry is irrelevant because DAB "unquestionably" once "met the definition in § 1603(a)," Faiq Br. 30.

But the question is not whether a central bank could theoretically be an instrumentality of a foreign state, or whether DAB *previously* had "instrumentality" status before August 2021. The question is whether DAB *maintained* that status at the time of Victims' attachment in March 2022. *Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 84 (2d Cir. 2014). Section 1603(b)(2), after all, "is expressed in the present tense," a congressional choice with "real significance," meaning that

5

any *former* instrumentality status is irrelevant to the immunity determination. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003) (citing 28 U.S.C. § 1603(b)(2)). Where a former instrumentality no longer qualifies, it is "not … entitled to instrumentality status" under the FSIA. *Id.* at 480.

The test is functional, examining the realities of how a supposed instrumentality operates in practice. An entity may be the "organ of a foreign state," and thus its agency or instrumentality, 28 U.S.C. § 1603(b)(2), when it "performs functions traditionally performed by the government," has personnel "appointed by" the government, and has its "operations overseen" by the government—*at the time of the attachment*. *Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004); *Exp.-Imp. Bank*, 768 F.3d at 84. Amici offer no evidence whatsoever that a functional agency relationship existed between Afghanistan and DAB when the attachment was granted. Victims' undisputed evidence, AOB 10-15, establishes that Afghanistan's former government is completely defunct, that DAB performs no meaningful central-banking functions, and that *the Taliban*, not Afghanistan, so thoroughly dominates DAB that DAB is the

Taliban's alter ego, AOB 57-66. On those facts, DAB cannot possibly be the "organ" of Afghanistan under Section 1603.

The organizational amici (but not Mr. Faiq) argue that courts should simply defer to Executive Branch pronouncements about whether an entity is an agency or instrumentality of a foreign sovereign. *See* Org. Br. 3-4. Victims already refuted that assertion in their opening brief, AOB 42-53, and amici offer no response. They do not even cite, much less respond to, this Court's precedent that "Executive Branch definitions" of an instrumentality "cannot be used" to ascertain the definition of a "foreign state" under the FSIA. *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 125 (2d Cir. 2016). Rather, as Mr. Faiq rightly concedes, "in the FSIA Congress assigned the judiciary the exclusive responsibility to make foreign sovereign immunity determinations." Faiq Br. 28 n.10.

Thus, because DAB is an alter ego of the Taliban, the Funds are not the "property of a foreign state."

7

## 2. Under *NML Capital*'s Governing Test, The Funds Were Not Held For DAB's Own Account At The Time Of Attachment

Even if the Funds could be regarded as the "property of a foreign state," Section 1611 immunity still would not apply. As Victims demonstrated, the Funds are not "held for [DAB's] own account" under this Court's controlling decision in *NML Capital*, and thus are entitled to no immunity. *See* AOB 66-70.

In response, Mr. Faiq puzzlingly argues that the test for Section 1611 immunity set forth in *NML Capital*—that funds held in the name of a central bank are "presumpti[vely]" immune unless they "are not being used for central banking functions," 652 F.3d at 194—is limited to that case's specific factual "context" and is thus inapplicable, Faiq Br. 27. (The Organizations just baldly assert that Section 1611 applies and precludes attachment. *See* Org. Br. 27-28). Mr. Faiq's view is apparently that *NML Capital* is relevant *only* for evaluating whether funds are being used for unprotected "generic commercial banking" functions under Section 1610 or for protected "central banking" functions under Section 1611. Faiq Br. 26.

8

That cramped reading of *NML Capital* overlooks the Court's reasoning and analysis. *NML Capital* was interpreting Section 1611(b)(1)'s generally applicable statutory language, not offering a good-for-that-case-only holding. *See* 652 F.3d at 194. *NML Capital* conducted a detailed survey of the text, history, and structure of Section 1611 before adopting a test proposed in a 1982 law review article, which was itself traceable to longstanding precedent on central-banking functions dating back to the 1950s. *See id.* at 188-94 (citing Ernest T. Patrikis, *Foreign Central Bank Property: Immunity from Attachment in the United States*, 1982 U. Ill. L. Rev. 265, 277 (1982)); *see also Bank of China v. Wells Fargo Bank & Union Tr. Co.*, 209 F.2d 467, 473-74 (9th Cir. 1953). The Court concluded that this general test—assessing whether funds were being used for "central banking functions"—"accords with the text and purpose of § 1611(b)(1)." *NML Cap.*, 652 F.3d at 194. It "therefore adopt[ed] th[e] test for purposes of determining whether central bank property is 'held for its own account'" and thus entitled to immunity. *Id.* Nothing about *NML Capital*'s interpretation of Section 1611's generally applicable language suggests the case's only application is to distinguish "generic commercial banking" from central-banking functions. Faiq Br. 26.

9

Next, Mr. Faiq argues that the Executive's blocking cannot "depriv[e]" central-bank assets—which supposedly "were being used for central banking functions prior to that blocking"—of Section 1611 immunity. Faiq Br. 27 (emphasis omitted). But Mr. Faiq mischaracterizes Victims' position. Victims are not arguing that President Biden's blocking order *itself* deprived the Funds of immunity, or that the Funds lack immunity merely because they are blocked. Instead, Victims dispute the (supposedly "indisputabl[e]") premise that the Funds "were being used for central banking functions prior to that blocking" once the Taliban took over Afghanistan. *Id.* In actuality, the Executive Branch blocked the Funds precisely because they were not being used—and would not be used—for central-banking functions by the Taliban vis-à-vis DAB. *See, e.g.*, AA301-03.

Certainly, the Funds cannot be used for central-banking purposes while they remain blocked, but the undisputed evidence is that they were not being used for central-banking purposes *before* they were blocked, and if the Taliban had access to the Funds today, they would not be used for legitimate central-banking functions, either. That was the conceded

10

premise for blocking them. *See, e.g.*, AA301 ("E.O. is designed to … kee[p] [Funds] out of the hands of the Taliban and malicious actors.").

As Victims detailed, central banks usually use monetary reserves to make loans to commercial banks, to regulate interest rates by repurchasing government bonds, to regulate the money supply, and to combat deflation. AOB 69. Once the Taliban took over Afghanistan and DAB in August 2021, the Funds were used for *none* of those purposes. Victims' undisputed expert affidavits, credited by the district court, established that DAB is no longer functioning as a central bank: Its dollar auctions, by which it injected cash from its foreign reserves into the Afghan economy, "have been curtailed," AA414, ¶ 67; it is "unable to print afghanis," *id.*; and foreign currency and aid that would normally be sent through a central bank are "being routed" around DAB. AA418-19, ¶ 81. Even the United States has conceded that DAB lacks "the expertise, capacity, and independence to responsibly perform the duties of a central bank." U.S. Embassy in Afghanistan, *Joint State-Treasury Statement: The Afghan Fund* (Sept. 13, 2022), https://af.usembassy.gov/joint-state-treasury-statement-the-afghan-fund.

Amici grapple with *none* of this evidence. Nor do they attempt to explain how, if DAB was no longer a functioning central bank after the Taliban takeover, the Funds *still* were "being used for central banking functions" in February 2022 when the Executive Branch blocked the Funds—seven months *after* Afghanistan's government collapsed.

Because Section 1611 cannot confer immunity in these circumstances, the district court's contrary decision should be reversed.

## B. Section 1609 Confers No Immunity On The Funds

Given the obvious problems with applying Section 1611 immunity, amici next suggest that the Funds instead are protected by Section 1609's general prescription that "the property … of a foreign state shall be immune from attachment ... and execution." 28 U.S.C. § 1609; *see, e.g.*, Faiq Br. 10-11, 29-30; Org. Br. 4, 26. That argument fails for multiple, independent reasons.

At the outset, Section 1609, like Section 1611, is not jurisdictional; the sovereign status of the Funds is far from certain, and no party has raised the issue. *Walters v. Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 286, 288 (2d Cir. 2011); *see infra* pp. 24-29. Thus, this Court need

12

not and should not consider Section 1609 immunity in the first instance. *See Quigley Co.,* 676 F.3d at 53 n.5; *Pulvers*, 210 F.3d at 96.

Regardless, amici's argument for immunity under Section 1609 fails on its own terms. Amici shift imprecisely between two distinct theories: (1) that DAB is the "agency or instrumentality" of Afghanistan, and thus that DAB's assets are the "property of a foreign state," *see* Org. Br. 4, 13, 23-25; Faiq Br. 5, or (2) that the Funds somehow belong directly to the "State of Afghanistan," Org. Br. 26; Faiq Br. 29-30. Both theories fall flat.

### 1. DAB Is Not An "Agency Or Instrumentality" Of Afghanistan, So Property Held In Its Name Is Not "Property Of A Foreign State"

As discussed, amici fail to grapple with Victims' extensive evidence and argument demonstrating that DAB was not an "agency or instrumentality" of Afghanistan at the time of attachment under Section 1603. *See supra* Part A.1. Amici's failure to provide any evidence on this front necessarily dooms their argument that DAB's assets are immune under Section 1609 as the "property of a foreign state."[1]

---

[1] Mr. Faiq's claim that Victims "d[id] not argue or even assert that § 1609 immunity has been abrogated," Faiq Br. 29, ignores Victims'

Amici's pivot to Section 1609 is misguided because any "analysis of the immunity of a foreign central bank's property *begins* with § 1611(b)(1)," *NML Cap.*, 652 F.3d at 190, and as amici recognize, Section 1611 is often viewed as providing "*extra* protection" for central bank funds, Faiq Br. 10; *see also* 28 U.S.C. § 1609 (providing general immunity for foreign-state property "except as provided in sectio[n] … 1611").  By asking the Court to focus on immunity under Section 1609 over Section 1611, *e.g.*, Org. Br. 24, amici implicitly concede the strength of Victims' argument against application of Section 1611.  But because DAB is not an "agency instrumentality of a foreign state" under Section 1603, the Funds are not "property of a foreign state" for purposes of either Section 1611 or Section 1609.

> ### 2.  The Funds Are Not Property Of The Notional "State Of Afghanistan"

Amici further posit—without clear explanation—that the Funds "belong to the state and only the state" of Afghanistan and thus enjoy

---

extensive arguments for why *no* FSIA immunity was triggered in the first place under Section 1603.  *See* AOB 55-57, 66.

Section 1609 immunity on that alternative basis. Org. Br. 26 (emphasis omitted); *see* Faiq Br. 30.

But amici's own authorities establish that central-bank assets should rarely be treated as assets of the parent sovereign—obviating the possibility of a fallback Section 1609 immunity. Even when they qualify as instrumentalities of a foreign state, central banks still are granted a strong "presumption" that they are "legally separate and distinct" from the parent sovereign. *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 89-91 (2d Cir. 2015). Litigants can refute that presumption with a "fact-intensive," evidence-based showing that the sovereign in fact exercises such "extensiv[e] contro[l]" over the central bank that "a relationship of principal and agent was created" or that "recognizing" its legal separateness would equate to "fraud." *Id.* at 91; *see also Dole Food Co.*, 538 U.S. at 475 (foreign states ordinarily should not be treated as having "legal title to the assets" of their instrumentalities).

In any event, amici provide no evidence-based showing that could permit DAB's assets to be treated as Afghanistan's for immunity purposes. Nor could they. The immunity determination must be made at the time of the attachment—not based on any former status. *See Exp.-*

15

*Imp. Bank*, 768 F.3d at 84. Amici do not even try to explain how DAB was Afghanistan's alter ego when attachment was granted in March 2022—eight months *after* Afghanistan's government collapsed. Victims' undisputed mountain of evidence, which the district court accepted as true, AA461-63, established that *the Taliban*, not Afghanistan, so extensively controls DAB that DAB is the Taliban's alter ego, AOB 58-66. Thus, given the Taliban's takeover of DAB, and the fact that no country has recognized the Taliban as the lawful government of Afghanistan, it would be nonsensical to conflate DAB—*i.e.*, the Taliban—with the state of Afghanistan.[2]

But even assuming arguendo that the state of Afghanistan once held a beneficial interest in the Funds owned by DAB that could render the Funds immune, amici's theory has yet another fatal flaw. Afghanistan could claim such an immunity only if it qualified as a "foreign state" under the FSIA at the time of attachment. 28 U.S.C. § 1603(b)(2). It did not, since it lacked essential features of a "foreign state" under this Court's precedents. *See* AOB 57 n.6.

---

[2] Notably, Mr. Faiq expressly concedes that DAB "was independent of the government" when that government existed. Faiq Br. 13.

As Victims explained in their opening brief, the Court "has limited the definition of 'state' to 'entit[ies] that ha[ve] a defined territory and a permanent population, [that are] under the control of [their] own government, and that engag[e] in, or ha[ve] the capacity to engage in, formal relations with other such entities.'" *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 47 (2d Cir. 1991) (alterations in original; citation omitted). Under this functional test, even where some entity purports to be a "state," the Court treats it as a non-state under the FSIA when the entity "lacks the ability actually to implement" and carry out the practical responsibilities of statehood. *Id.* at 48.

Applying those principles, Victims' unquestioned evidence established that Afghanistan cannot currently meet the definition of a "foreign state" under the FSIA. *See, e.g.*, AOB 57-66. Afghanistan is not "under the control of [its] own government." *Klinghoffer*, 937 F.2d at 47. To the contrary, Victims repeatedly demonstrated below that Afghanistan is under the control of a terrorist organization—the Taliban—which both amici expressly concede is a "non-state actor." *See* Faiq Br. 17; Org. Br. 3, 13, 25; AOB 57-66. Without a recognized government, the notional

17

"State of Afghanistan" has no "capacity to engage in … formal relations with other such entities [*i.e.*, states]." *Klinghoffer*, 937 F.2d at 47.  Afghanistan's former embassies, which have nothing to represent, have closed around the world, and its former diplomats face deportation.[3]  Individuals like Mr. Faiq may purport to continue representing "the Afghan people," but even Mr. Faiq is forced to concede that he has no warrant to do so from any underlying government.  Faiq Br. 1-2.  Such purported representation—absent an "ability actually to implement" actions on Afghanistan's behalf—is insufficient to establish "foreign state" status under the FSIA.  *Klinghoffer*, 937 F.2d at 48.

Amici accuse Victims of conflating a "state" with its "government." *See, e.g.*, Org. Br. 15-18.  Victims have no quarrel with that generic distinction.  But it is simply beside the point *here*, where the question is whether an entity continues to be a "foreign state" for purposes of the FSIA in the complete *absence* of "control [by its] own government."

---

[3]    *See, e.g.*, Lara Jakes, *Afghan Embassy, Now Out of Money, Will Shut Down, U.S. Says*, N.Y. Times (Mar. 11, 2022), https://tinyurl.com/3kjenadc; Ashok Sharma, *Afghan Embassy Says It Is Stopping Operations in Indian Capital*, AP News (Sept. 29, 2023), https://tinyurl.com/2m5myjek.

*Klinghoffer*, 937 F.2d at 47.  This Court's precedents foreclose the notion that a "foreign state" persists under the FSIA in that circumstance.  *See id.*[4]

Those same points also highlight the errors in amici's arguments about Afghanistan's supposed "ownership" of and "title to" DAB's funds. *Cf.* Org. Br. 4; Faiq Br. 29-30.  Even if Afghanistan once *had* a beneficial interest in the Funds, it would have lost its claim by virtue of its incapacity to function as a "foreign state."  As authorities have long recognized, when a former state becomes defunct, it loses title to state property: "Complete conquest, by whatever mode it may be perfected, carries with it all the rights of the former government, or in other words, the conqueror, by the completion of his conquest, becomes the absolute owner of the property conquered from the enemy, nation, or state."  *United States v. Huckabee*, 83 U.S. (16 Wall.) 414, 434-35 (1872) (citing treatises); *see also* D.P. O'Connell, *The Law of State Succession* 229 (1956) ("All public funds of a totally absorbed State become the property of the successor.");

---

[4]    Victims do not question that there is still literally a place on the map called "Afghanistan."  The point is that the notional "State of Afghanistan" cannot meet this Court's test for "foreign state" status under the FSIA.

Arthur Berriedale Keith, *The Theory of State Succession* 49 (1907) ("On any theory, on cession or conquest, the succession to the public domain is complete. Such things as harbours, roads, fortifications, schools, prisons, public buildings, if the property of the old state, pass to the cessionary and are taken possession of by the conqueror."); Oscar Svarlien, *An Introduction to the Law of Nations* 120 (1955) (noting that "public buildings and funds … become the property" of the successor).

Succession ordinarily presents no immunity issue because the successor is typically *itself* a state; thus, at least *some* state always has title to that property. (And that point is all the more obvious where the same state merely changes its government.) But that is why this case is *sui generis*: the "State of Afghanistan" is now defunct, and it has been succeeded by the Taliban—a conceded *non-state* actor. *See* Faiq Br. 17; Org. Br. 3, 13, 25. Unlike the usual fact pattern, here, a non-state actor with no claim to immunity has supplanted the former, defunct state.

That distinction underscores why amici's policy arguments ring hollow. In amici's view, ruling in Victims' favor would declare open season on foreign sovereigns' central-bank reserves held in the United States. *See* Org. Br. 24-25; Faiq Br. 4. But that concern is untethered from

reality. In the vast majority of cases, funds held in the name of a central bank serving as the instrumentality of an *existing* foreign state will unambiguously qualify for immunity under 28 U.S.C. § 1611(b), since there will be no conceivable dispute that those funds constitute the "property of a foreign state." Victims are aware of no other instance—and amici suggest none—where a *former* state and its government were toppled and displaced by a *non-state* terrorist organization that succeeded to what used to be the foreign state's property. Those *sui generis* circumstances made this case possible—and likewise reflect just how limited are the implications of Victims' position.

### D. Amici Do Not Seriously Contest That Attachment Was Otherwise Proper Under New York Law

Perhaps most telling is what amici have chosen *not* to seriously contest: that if their immunity arguments fail, attachment was otherwise proper under New York law and Second Circuit precedent. Only the Organizations even tangentially address the mechanics of attachment, arguing that the Taliban's "control" of DAB does not mean the Taliban "owns" the Funds, and thus that Victims cannot use the Funds to satisfy the Taliban's judgment debt. Org. Br. 25-28. Yet the Organizations omit

any supporting analysis of New York law—which strongly supports Victims' position.  *See id.* (citing TRIA cases).

With respect to attachment, federal law incorporates the law of the state in which the district court sits (here, New York).  *See* Fed. R. Civ. P. 64(a).  New York adopts a "practical approach" to attachment.  *Hotel 71 Mezz Lender LLC v. Falor*, 926 N.E.2d 1202, 1209 (N.Y. 2010).  Under New York law, "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 [of New York's Consolidated Laws] is subject to attachment."  N.Y. C.P.L.R. § 6202.  Section 5201, in turn, provides that "[a] money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested."  *Id.* § 5201(b).  The relevant question, therefore, is simply whether the Taliban has a current or future "interest" in the Funds.

Victims established that interest here.  DAB has title to the Funds, and the Taliban so extensively dominates and controls DAB that DAB is effectively the Taliban's alter ego.  AOB 58-66.  Control-based alter-ego theories are well-recognized bases for attachment and execution under New York law.  *See, e.g.*, *Metro. Diagnostic Imaging Grp., LLC v. U.S.*

22

*Heartcare Mgmt., Inc.*, 2010 WL 3073727 (N.Y. Sup. Ct. July 26, 2010) (pre-judgment attachment granted on assets of alter ego); *Laco X-Ray Sys., Inc. v. Fingerhut*, 88 A.D.2d 425, 433 (N.Y. App. Div. 1982) (granting motion to levy execution on assets of alter ego); *Palestine Monetary Auth. v. Strachman*, 62 A.D.3d 213, 222-23 (N.Y. App. Div. 2009) (alter ego's assets "can be levied to enforce the judgment"). And this Court, too, has recognized that where one entity is "so extensively controlled" by another entity as to form an alter-ego relationship, attachment may be granted on the former's assets in a suit against the latter. *EM Ltd.*, 800 F.3d at 85.

Here, Victims' undisputed evidence establishes conclusively that DAB is the Taliban's alter ego. *See* AOB 58-66. Because DAB is *not* a sovereign entity, for the reasons Victims explained throughout their opening brief and reiterate here, DAB is *not* entitled to any presumption of separateness from the Taliban under New York law. *Palestine Monetary Auth.*, 62 A.D.3d at 222-23. To the contrary, "[t]he burden, in fact, lies with [DAB] to show that it is a separate entity and not the alter ego of the [Taliban]." *Id.* And *nothing* in the record reflects how DAB—which chose not to appear despite being served—has discharged that burden.

23

## II. The District Court Erred In Enforcing Attachment Immunity *Sua Sponte*

The district court's immunity determination was not only wrong on the merits but never even should have occurred. The district court crafted the Funds' execution immunity *sua sponte* despite Victims' strenuous contention that the Funds do not belong to any foreign sovereign. Amici baldly assert that it was proper for the district court to enforce attachment immunity *sua sponte*, but they provide no basis for *sua sponte* enforcement in these circumstances.

### A. *Verlinden* And *Walters* Do Not Authorize *Sua Sponte* Enforcement Of Attachment Immunity

Mr. Faiq contends that the "Supreme Court and this Court have held that a district court in fact *should* evaluate" attachment immunity *sua sponte* when the foreign sovereign is absent. Faiq Br. 6-7, 22 (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983); *Walters*, 651 F.3d at 291). But Mr. Faiq badly misreads those precedents. *Verlinden* held only that *jurisdictional* immunity under the FSIA—like all questions of "subject matter jurisdiction"—should be considered *sua sponte*. 461 U.S. at 493 n.20. The Supreme Court there did *not* address

24

"the circumstances under which attachment and execution may be obtained against the property of foreign states." *Id.* at 495 n.22.

*Walters* reiterates that distinction: "the FSIA's provisions governing jurisdictional immunity, on the one hand, and execution immunity, on the other, operate independently." 651 F.3d at 288. While courts have an "independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*," *id.* at 287 (citation omitted), the same is not true for attachment immunity. *Walters* held only that courts *may* enforce attachment immunity *sua sponte* when the action involves "an *undisputed* foreign sovereign" and when the attempted attachment is "against what are *undisputed* sovereign assets." *Id.* at 293-94 (emphases added). But *Walters* expressly reserved the question whether *sua sponte* enforcement is proper when the sovereign ownership of disputed assets "is in doubt." *Id.* at 294 n.11. And it certainly could not have "held" that a district court *should* evaluate attachment immunity *sua sponte* when sovereign ownership is contested, since "there [was] *no* dispute" in that case that the assets were sovereign. *Id.* at 291 (emphasis added). As Victims detailed in their opening brief, each of the other circuits to address the question have held that it is improper for courts to *sua sponte*

25

enforce attachment immunity where the sovereign status of assets is uncertain, and this Court should adopt that rule, which follows from a long historical tradition that predates the FSIA.  AOB 37-38.[5]

## B.   The Sovereign Status Of The Funds Is Unclear

Mr. Faiq quibbles (at 11, 22-23) that the sovereign status of the assets held in DAB's name is not actually "unclear," because an unrecognized government purportedly cannot claim title to assets of a foreign *state* in the United States.  That principle does not apply here for the reasons explained above.  Not only were the assets held in the name of DAB, rather than the state of Afghanistan, but neither DAB nor Afghanistan qualifies as a foreign state:  The "state of Afghanistan" is currently defunct, and DAB is the Taliban's alter ego, not Afghanistan's.  *See supra* pp. 16-20.  Certainly, the sovereign status of the Funds is not "readily apparent," or beyond dispute, making it improper for the district court to have enforced attachment immunity *sua sponte*.  *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1128 (9th Cir. 2010).

---

[5]  Mr. Faiq also cites (at 22) Victims supposed "concession" that the district court could enforce execution immunity *sua sponte*, but Victims have already explained why they conceded no such thing, AOB 41.

### C. Jurisdictional Immunity Is Not At Issue

In a similar vein, Mr. Faiq argues (at 7, 22) that "in this context the immunity issues *are* jurisdictional" because "an exception to jurisdictional immunity" under the FSIA is required for "civil litigants [to] take sovereign assets." But that response just begs the question. It assumes the assets at issue *are* "sovereign"—the very issue in dispute, and the very issue that precludes *sua sponte* enforcement of attachment immunity.[6]

At a more fundamental level, Mr. Faiq's response would improperly collapse the well-established distinction between jurisdictional and attachment immunity. *See Walters*, 651 F.3d at 288. This Court has already rejected the idea that "claims of immunity from attachment" are jurisdictional merely because a court typically must make a "threshold determination of FSIA immunity from suit" before reaching the attachment-immunity question. *Vera v. Republic of Cuba*, 651 F. App'x 22, 25 (2d Cir. 2016).

---

[6] In a footnote, Mr. Faiq similarly asserts that "the district court lacked statutory jurisdiction to order attachment" of the Funds. Faiq Br. 5 n.3. But jurisdiction here is straightforward under numerous statutory provisions independent of the FSIA. *See* AA167, ¶¶ 4-6.

27

Of course, "a court is always required to confirm that it has subject matter jurisdiction," *id.*, but the district court rightly saw no need to analyze issues of jurisdictional immunity here, because subject-matter jurisdiction is clear and not based on the FSIA. No foreign sovereign—purported or otherwise—is a party to the litigation. The FSIA gives federal courts subject-matter jurisdiction over "civil action[s] against a foreign state," 28 U.S.C. § 1330(a), but the only defendant here is the Taliban—a non-state actor. A "lawsuit *must* go through the FSIA gateway" "[i]f the defendant is a foreign state," but where, as here, "the defendant *is not a foreign state*, the gateway closes: § 1330(a) does not authorize jurisdiction, and § 1604 does not confer immunity." *United States v. Assa Co.*, 934 F.3d 185, 189 (2d Cir. 2019) (second emphasis added).

Victims brought suit against the Taliban under the Anti-Terrorism Act, the Alien Tort Statute, and state law, and the district court's jurisdiction thus derives not from the FSIA, but from other statutory provisions—28 U.S.C. §§ 1331, 1350, and 1367(a). AA167, ¶¶ 4-6. To secure their judgment, Victims sought a writ of prejudgment attachment against the Funds, but the garnishee holding the Funds is the Federal Reserve, not DAB. Thus, no foreign sovereign entity is even potentially

28

a party to this case. The FSIA does not "displac[e]" the "other statutory bases for jurisdiction" here. *Assa Co.*, 934 F.3d at 188-89.

### D. *Pimentel* Is Inapposite And Does Not Require Joinder

Mr. Faiq finally argues (at 24-25) that *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), "squarely foreclose[s]" the proposition that *sua sponte* enforcement of attachment immunity is improper "where the sovereign is absent, and it is unclear that the property at issue actually belongs to a sovereign entity."

**1.** In reality, *Pimentel* never *considered* that question, much less decided it, and any contrary suggestion is highly misleading. *Pimentel* stands for a different proposition: A court "*may*" "consider *sua sponte* the absence of a required person and dismiss for failure to join" under Rule 19. 553 U.S. at 861 (emphasis added).

To even describe *Pimentel* is to distinguish it. That case concerned the Philippines' claim to assets misappropriated by its former President and held by Merrill Lynch in the United States. Because another class of plaintiffs claimed the same property, Merrill Lynch filed an interpleader action naming the Philippines and the class. The Philippines, which was vigorously pursuing a claim to those assets in a Philippine

court, showed up in the U.S. litigation, asserted sovereign immunity, and was dismissed from the suit. 553 U.S. at 859. The Supreme Court subsequently ruled that the suit could not proceed in the Philippines' absence because the country was a necessary and indispensable party under Rule 19. *Id.* at 873.

*Pimentel* accordingly has nothing to do with Victims' attachment. The Philippines was indisputably a valid sovereign; it was plainly asserting a "claim" to the property in other litigation; it appeared in the U.S. litigation over the assets to assert its own sovereign immunity; and the immunity it invoked was *jurisdictional* immunity, not execution immunity as to the assets. *Pimentel* had no occasion even to consider a district court's authority to enforce attachment immunity *sua sponte*.

**2.** To the extent Mr. Faiq half-heartedly suggests that Victims needed to join Afghanistan as a party under Rule 19 in light of *Pimentel*, that, too, is mistaken. At the outset, Mr. Faiq has not properly developed this argument, and it was neither raised nor considered below, so this Court need not consider it. *Cf. Provident Tradesmens Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 112 (1968) (reversing court of appeals' dismissal of suit on nonjoinder grounds under Rule 19(b) when issue was raised for

30

the first time on appeal, in deference to plaintiffs' "interest in preserving a fully litigated judgment").

But a Rule 19 argument also fails on the merits.  As *Pimentel* explained, Rule 19 demands a two-part inquiry:  Rule 19(a) defines "required parties" to the suit, including, as relevant here, "[a] person who is subject to service of process" and who "claims an interest relating to the subject of the action" that would be impaired without the person's participation in the action.  Rule 19(b), in turn, addresses "when a suit may go forward nonetheless" even in that party's absence, based on considerations of "equity and good conscience."  *Pimentel*, 553 U.S. at 862, 867; Fed. R. Civ. P. 19(a)(1)(B)(i), (b).  In *Pimentel*, it was not contested that the Philippines was a necessary party asserting a "claim" under Rule 19(a), given the nation's collateral litigation over the same property abroad.  553 U.S. at 863-64.  The only dispute was whether Rule 19(b)'s "case-specific inquiry" required the action to be dismissed due to the Philippines' absence in the U.S. suit.  *Id.* at 864, 866.

In contrast, this is not a case where a sovereign has claimed an interest in an interpleader suit entirely concerning rightful title to assets, where a court has dismissed a sovereign named in the complaint on

31

immunity grounds, and where the court nonetheless ruled against the sovereign's claim in its absence. *See* 553 U.S. at 868-72. This case concerns anti-terrorism claims against *the Taliban* for its support of al-Qaeda's terrorist acts and seeks recovery from *the Taliban* of assets held in the name of an entity under *the Taliban*'s control. Victims have not named the State of Afghanistan as a party, which has neither claimed nor could claim an interest that would be impaired by this suit. *See infra* pp. 33-34.

To the extent *any* third party's interest in the disputed assets could be impaired by nonjoinder, it is DAB, which holds the disputed assets in its name. Notably, even though DAB is not a party, Victims *did* serve DAB with notice of their prejudgment attachment, AA117-18, giving DAB an opportunity to assert a claim in the Funds. DAB did nothing. Its failure to "clai[m]" an interest in the Funds, Fed. R. Civ. P. 19(a)(1), is fatal. *See Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 49 (2d Cir. 1996) (holding that sovereign entity was not a required party under Rule 19(a) because it had not "claimed an interest relating to the subject of the action" (alteration omitted)).

Moreover, the question whether DAB could feasibly be joined under Rule 19—*i.e.*, whether it is protected by sovereign immunity—turns on whether DAB remains a sovereign entity at all. As Victims have shown, DAB is a non-state entity subject to the Taliban's control and no longer protected by sovereign immunity. Even if DAB's joinder was required, that would be no basis for dismissal. DAB was effectively named a party through the Taliban, which now controls it. Indeed, DAB would participate in this litigation only as an arm of the Taliban.

Similarly, the text of Rule 19 confirms twice over that Afghanistan is not a required party. *First*, like DAB, Afghanistan has "claim[ed]" no interest in the disputed assets held in DAB's name. Fed. R. Civ. P. 19(a)(1)(B). More fundamentally, Afghanistan has no *capacity* to assert such a claim, given its current inability to "engage i[n] formal relations with other" governments. *Klinghoffer*, 937 F.2d at 47; *see also supra* pp. 17-18. Mr. Faiq concededly has no authority to make that claim on Afghanistan's behalf; he admits (at 1-2) that the Taliban does not recognize his position and that he does not represent the former government of Afghanistan. *See Peregrine*, 89 F.3d at 49 (defendant could not assert

claim on absent sovereign entity's behalf because "[i]t is the absent party that must 'claim an interest'" under Rule 19(a)).

*Second*, even if Afghanistan were a necessary party under Rule 19(a), Rule 19(b)'s focus on "equity" requires the suit to proceed. The "State of Afghanistan" has no capacity to claim entitlement to the Funds, and it has not done so. The only result of dismissal would be to seriously prejudice Victims, who have a fully litigated judgment otherwise enforceable through an attachment that undisputedly satisfies New York law. Courts are "extremely reluctant" to dismiss "based on nonjoinder," and this is not the rare case where "equity and good conscience" compel dismissal. 7 Wright & Miller, Fed. Prac. & Proc. Civ. § 1609 (3d ed.).

\* \* \*

Despite amici's best efforts, their briefs offer no legal basis to affirm the district court's *sua sponte* enforcement of sovereign immunity. Victims are sympathetic to amici's concerns for the Afghan people, who have also suffered at the hands of the Taliban. But amici's policy arguments are misguided and misdirected. As Victims explained in their opening brief, the Funds *never* belonged to the Afghan people in any relevant sense. AOB 70-71. Before the Taliban took over DAB and claimed the

Funds, they were reserves of a central bank "for its own account"—*i.e.*, to regulate the monetary supply—largely funded by the United States. *Id.* They were not accounts of individual Afghans.

To the extent that amici argue that the "remaining" Funds *should be* "used for the people of Afghanistan" for "humanitarian" and "human rights" purposes, Org. Br. vii-viii, their quibble is with the Executive Branch, not Victims. President Biden seized the Funds—underscoring that they no longer had any sovereign status—and then chose to divert half for humanitarian relief for Afghanistan. AA342; AA298; *see Rubin v. Islamic Republic of Iran*, 830 F.3d 470, 480 (7th Cir. 2016) ("Seizing a foreign state's property is a serious affront to its sovereignty"). Prior to the Taliban takeover and Executive Branch seizure and diversion of the Funds, Afghan humanitarian organizations had no claim to the Funds whatsoever. That the Executive Branch then chose to leave the other half available for "victims of terrorism" to satisfy their "legal claims" against the Taliban was its policy choice. AA234. Any attempts to get this policy reversed must be directed to the political branches—not this Court. As President Biden recognized, Victims have suffered heinous

acts of terrorism at the hands of the Taliban, and they too are entitled to relief.

## CONCLUSION

This Court should reverse the district court's February 24, 2023 order vacating Victims' prejudgment attachment of the blocked Funds.

Dated:  November 6, 2023

Clifton S. Elgarten
Emily M. Alban
CROWELL & MORING LLP
1001 Pennsylvania Ave. N.W.
Washington, D.C. 20004
Telephone:  (202) 624-2500
Facsimile:  (202) 628-5116
celgarten@crowell.com
ealban@crowell.com

Jane Carol Norman
BOND & NORMAN LAW, PC
6205 Executive Blvd.
Rockville, MD 20852
Telephone:  (202) 682-4100
Facsimile:  (202) 207-1041
jnorman425@icloud.com

Respectfully submitted,

 /s/ *Matthew D. McGill*

Matthew D. McGill
    *Counsel of Record*
Jessica L. Wagner
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9522
mmcgill@gibsondunn.com
jwagner@gibsondunn.com

Robert L. Weigel
Jason W. Myatt
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone:  (212) 351-4000
Facsimile:  (212) 351-5236
rweigel@gibsondunn.com
jmyatt@gibsondunn.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.    This reply complies with the type-volume limitation of Circuit Rule 32.1(a)(4)(A) because it contains 6,970 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

2.    This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

Dated: November 6, 2023                    By: */s/ Matthew D. McGill*
                                                                    Matthew D. McGill

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2023, I caused the foregoing Reply Brief of Plaintiffs-Appellants to be filed with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system and served on all counsel of record via CM/ECF.

Dated: November 6, 2023                    By: /s/ *Matthew D. McGill*
                                               Matthew D. McGill